In the Matter of the Estate of SYLVIA F. SACKS, Infant.

Surrogate's Court, New York County, September 6, 1934.

*William Flatto*, for Esther L. Sacks, one of the executors of the estate of Herman A. Sacks, guardian.

*Louis H. Levin*, for S. Alexander Sacks and another, coexecutors of the estate of Herman A. Sacks, guardian.

*Siegel & Corn* [*Isaac Siegel* of counsel], for Rose Jacobs, guardian of Sylvia F. Sacks, infant, objectant.

*Thomas J. Meehan, Jr.*, for the Maryland Casualty Company, objectant.

*Edward F. Keenan* [*J. Francis Lynch* of counsel], for the Superintendent of Insurance of the State of New York, as liquidator of National Surety Company, objectant.

*Frederick W. McGowan* [*Robert J. Sykes* of counsel], for the National Surety Corporation, objectant.

DELEHANTY, S. In July, 1920, letters of guardianship of the person and estate of the above-named infant were issued out of this court to Herman A. Sacks, her father. The latter died in July, 1933, and after proceedings duly had in this court to compel an account of his proceedings his executors filed an account to which objections have been filed by the successor guardian of the infant. Objections have also been filed by Maryland Casualty Company, by the Superintendent of Insurance of the State of New York, as liquidator of National Surety Company, and by National Surety Corporation. These companies were, respectively and in the order named, sureties on the bond of the guardian during portions of his service as such.

The deceased guardian was in a business from which he derived a substantial livelihood. He had the legal obligation to maintain and support his daughter, the infant, without trespassing on her individual resources. The court finds as a fact that he had ample

funds with which to support her during the period in which he claims certain credits for expenditures in her behalf. The claim of credit for such expenditures is accordingly disallowed in its entirety. Such claim of credit relates to a period during which Maryland Casualty Company was the surety. The latter takes the position that the objections filed are not broad enough to warrant inquiry into the propriety of these disbursements. The court is of a contrary view. The issue was in fact tried and the decree to be entered will adjudge the guardian liable for the amount so used improperly of the infant's funds.

During the period of the guardianship there were paid small monthly checks by Veterans' Bureau on a policy for the benefit of the infant taken out by her uncle. Only a part of the funds received from the Veterans' Bureau were accounted for by the guardian in his annual reports. In so far as such funds were not so accounted for the decree to be entered will surcharge the deceased guardian. It is stated in the brief filed in behalf of the infant that during the period that Maryland Casualty Company was surety checks aggregating $182.94 received from the Veterans' Bureau were not accounted for. If proof of this is in the record, or if the fact stated is accepted by Maryland Casualty Company as correct, the gross surcharge of the deceased guardian for the period when Maryland Casualty Company was surety will be fixed at the sum of $901.44. If the amount of unaccounted for checks is disputed by Maryland Casualty Company further proof will be taken on this point. Against this gross surcharge will be credited the premiums actually paid to this surety by the guardian and not heretofore claimed as credit by the guardian's representatives. These are said by Maryland Casualty Company to amount to $457. Maryland Casualty Company asks that further credit be given for commissions. The court will not allow commissions to the deceased guardian.

The first claim of disbursement in behalf of the infant was made by the guardian in his annual report dated January 30, 1926, and is obviously designed to offset an item of receipts in the same amount which reports erroneously the total of checks theretofore received over a period of years from the Veterans' Bureau. Interest should be charged, therefore, upon the actual receipts from the Veterans' Bureau, the proceeds of all of which (by reason of the refusal of any credit for personal expenses of the infant) are held to have been in the guardian's hands undeposited and to have been used by him improperly. An offsetting interest credit will be allowed upon each item of bond premium from the date when such bond premium was paid. The net interest item will be added

to the surcharge for this period and the decree to be entered will specify that such surcharge as so ascertained relates to the period of suretyship of Maryland Casualty Company. If the estate of the deceased guardian is unable to respond to the surcharge the amount thereof will be fixed for the purpose of any further proceedings against Maryland Casualty Company under section 115-a of the Surrogate's Court Act.

Following the retirement as surety of Maryland Casualty Company the guardian furnished the bond of National Surety Company, which is now in liquidation. The latter company, through the Superintendent of Insurance as liquidator, entered into an agreement with National Surety Corporation whereunder the latter undertook a limited obligation upon the bond of National Surety Company issued in behalf of this deceased guardian. The extent of such obligation of National Surety Corporation is in issue here. National Surety Corporation insists that it has established facts which require the court to hold it free of all liability; and that National Surety Company (if any one) is liable for the further conceded deficit in estate assets. National Surety Company through its liquidator asserts that National Surety Corporation only is liable for such admitted further deficit.

The annual report of the deceased guardian filed in 1926 shows as of December 31, 1925, the sum of $6,926.81 in cash on hand in named banks. The report filed May 9, 1927, for the period ending December 31, 1926, shows cash on hand in named banks of $7,298.87. The report filed February 11, 1928, for the period ending December 31, 1927, shows cash on hand in named banks of $7,576.83. The report filed March 8, 1929, for the period ending December 31, 1928, shows cash on hand in named banks of $7,951.47.

Beginning with the report filed July 16, 1930, for the one and a half year period ending July 1, 1930, the guardian for the first time shows on hand certain Liberty bonds. In this report they are scheduled as fourth Liberty bonds and of the par value of $7,600. Certain cash balances are reported on hand in named banks so that the aggregate estate is reported at $8,668.92. For the year ending July 1, 1931, the guardian filed on July 16, 1931, a further report showing on hand the same quantity of Liberty bonds (issue not specified) and cash on hand in savings banks making, with the Liberty bonds, an aggregate estate of $9,145.68. For the year ending July 1, 1932, the guardian on September 22, 1932, filed a report showing on hand the same quantity of Liberty bonds (issue again not specified) and cash on hand in savings banks which, added to the Liberty bonds, made a total estate of $9,604.09. In the last account filed by the guardian on July 17,

1933, for the year ending July 1, 1933, the guardian reported on hand Liberty bonds (issue again not specified) in the sum of $8,600, an increase of $1,000. He reported likewise cash on hand in savings banks which, with the Liberty bonds reported, brought the aggregate of the estate to $10,079.42.

Concededly the actual cash reported as on hand December 31, 1928, by the report dated March 8, 1929, was, on March 7, 1929 (but not on December 31, 1928), actually on deposit in two respective savings accounts entitled " Herman A. Sacks, guardian of Sylvia Sacks." No question is raised that the bank balances shown in the subsequent annual reports filed by the deceased guardian were actually in the respective banks named in such reports at the dates specified in such reports. The court is satisfied from the proof that as of the date of filing of the reports of July 16, 1930, July 16, 1931, and September 22, 1932, there were exhibited by the guardian to the guardian accounting clerk of this court Liberty bonds having a par value of $7,600, this being the amount specified in such respective annual reports. At the time the report for the year ending July 1, 1933, was filed the deceased guardian was ill of the disease from which he died shortly thereafter. On July 18, 1933, his brother presented for filing the guardian's report dated July 17, 1933. This report and the previous reports are all in the handwriting of the deceased guardian. The last one referred to was filed without any exhibit of Liberty bonds. Deceased guardian's brother reported the illness of the guardian and the latter's promise to produce evidence as to his possession of such bonds when able to attend to business.

A real controversy here is whether the deceased guardian had any of the Liberty bonds in question on or after May 1, 1933, the date of the assumption of liability by National Surety Corporation. He had $7,600 of Liberty bonds on September 22, 1932, and he presented those to the guardian accounting clerk as the property of the estate of this infant. No Liberty bonds were found in his possession or among his effects after his death. His executors assert that they have searched for them but have been unable to find any.

National Surety Corporation, asserting defalcation by the deceased guardian antecedent May 1, 1933, presented proof of the transactions of this guardian over many years with the moneys of the estate and also proof of a transaction in Liberty bonds as of September 22 and September 23, 1932; and on the basis of the proof thus presented asks the court to hold that no act or transaction of the deceased guardian on or after May 1, 1933, imposed any liability on National Surety Corporation.

The records of the savings banks in which the estate accounts were kept show long-continued irregularities by the guardian in the handling of estate funds. For the purpose of the filing of his annual inventory required by statute the irregular withdrawals of the infant's funds were covered up by the deceased guardian making temporary deposits out of his other funds. These temporary deposits were withdrawn either in whole or in part soon after they had served the purpose of deceiving the guardian accounting clerk of this court. In his will deceased speaks of having borrowed from the estate of his daughter a sum of $5,000 and of having provided for repayment of this amount by means of an insurance policy. His declaration of this borrowing plus the proof furnished by the bank transcripts establishes sufficiently that the deceased guardian had improperly used his daughter's funds. The proof of the brokerage transaction is that on September 22, 1932, a broker delivered to the guardian Liberty bonds of the fourth issue of the face value of $7,600 and that the same broker the next day sold for the guardian the same quantity of Liberty bonds. The proof shows that the guardian paid for the purchase on September twenty-second by certified check drawn upon his partnership account. It also shows that the proceeds of the sale of the Liberty bonds on September 23, 1932, went into that partnership account. Argument is made that since there was established a system of defalcation which involved the temporary replacement of money for the purpose of inspection by the guardian accounting clerk of this court, there must be drawn the inference that the purchase of these Liberty bonds in an amount identical with that represented in the report to be on hand was intended for the same limited purpose and that such bonds, even if deemed to be the property of the estate on September 22, 1932, were sold and the proceeds misappropriated by the guardian on September 23, 1932. The fact that no trace of any Liberty bonds is now found supports this claim.

It is argued contra that there is no showing that the bonds exhibited to the guardian accounting clerk on September 22, 1932, were the same bonds purchased by the guardian with partnership funds; and that likewise there is no showing that the Liberty bonds sold on September 23, 1932, were those purchased the preceding day or those belonging to the estate. Counsel for the successor guardian asserts that nothing in the transaction with the brokerage house diminishes the effect of the written declaration by the deceased guardian that he had $7,600 of Liberty bonds on hand on July 1, 1932; that nothing has diminished the effect of the actual exhibit of such bonds in the possession of the guardian on

September 22, 1932; and that nothing has been presented which diminishes the effect of the guardian's declaration under date July 17, 1933, that he had on hand on July 1, 1933. $8,600 of Liberty bonds belonging to the estate.

The guardian's reports constitute admissions by him. Such admissions are not conclusive. The sureties who are parties to the controversy are entitled to make explanation of such admissions. In the light of the guardian's handling of his trust it seems reasonable to find, as the court does, that these declarations in the annual accounts were made as a necessary part of his scheme of deception of this court. So considered, they are without weight in establishing the actual possession of Liberty bonds unless in confirmation of other proof indicating such possession. Whatever of weight is in the admissions is over-borne by the actual fact of non-possession of the bonds at the time of his death.

Whatever had been the diversions of the infant's funds prior to March 7, 1929, it is established that on the latter date the capital of the estate was on deposit in a savings account entitled in the name of the guardian as such. We may start, therefore, with that date in the assurance that both the guardian and his surety for the time being are thenceforth chargeable with that quantity of cash at least. There is little likelihood, however, that such fund represents the true capital of the infant's estate as of that date and proper accounting would require a complete restatement of receipts and disbursements. In some instances the guardian has taken no credit for bond premiums and in others his annual reports when scrutinized appear to indicate credits for interest which seem not to correspond to the actual interest which would have accrued had the funds been in the savings bank as the annual account reported. The guardian should be charged with six per cent interest upon diverted funds of the infant for the respective periods that such funds were in fact in his hands undeposited or which were deemed to be in his hands because credit for claimed expense was disallowed. The actual interest received on the funds while they were in fact in the savings bank in a guardian account is all that the estate can claim for such periods on the funds so in bank. The bank transcripts show what moneys were in the bank at the different periods and while the computations will be tedious it will not be difficult to ascertain by comparison with acknowledged or proven capital receipts what quantity of estate funds were undeposited and the period of such withholding from deposit. Nothing short of this recomputation will state this guardian's account correctly.

Reference to the annual inventories discloses that the appointment of the guardian was in July, 1920. Presumably he furnished a bond of some amount and paid some premium. He makes no claim for any disbursement of that sort in his first inventory filed May, 1922. There is similar lack of claim for bond premium disbursement in every inventory filed down to and including March, 1929, though the inventory filed in 1930 claims premium disbursements for the years 1928 and 1929. Some premium disbursement is claimed each year thereafter. The surety companies can furnish the data as to actual amounts paid and the respective dates of payment.

Turning to the matter of interest: The report filed in 1922 reports none; that filed in 1923 reports none though the guardian acknowledges on hand from August seventeenth of the preceding year over $6,000 of capital funds; that for the year 1923 reports interest but whether correctly must be ascertained; that for the year 1925 reports interest but the contrast between that reported in 1924 and that reported in 1925 shows clearly that either the amount of actual receipt is reported incorrectly or that the lesser sum received in the latter year is because the guardian had the money in his own hands instead of in the bank; and that for the year 1926 reports interest on savings bank deposits at a rate which figures out over five per cent per annum, obviously in excess of what was actually paid by the savings bank unless the total interest reported was credited for more than the yearly period which the inventory purported to cover.

The transcripts of the accounts in the savings banks will disclose the actual interest credits as well as the amount on deposit. With these and with the dates of receipt of principal and the amount thereof available from the annual inventories a restatement of the guardian's accounts should be prepared wherein he will be charged with the estate in cash throughout the whole period and with the interest thereon for the period of deposit at the actual rate received on such portions as were deposited and with legal interest for the period of non-deposit on such portions as were not deposited. Against this will be credited only the amount disbursed for bond premiums with interest at the legal rate from the date of actual payment of such premiums. If the record does not contain the data necessary for this computation the hearing will be reopened unless counsel can agree to stipulate the additional facts. These computations will require the charging of the guardian with the principal of all payments received from the Veterans' Bureau together with interest for the period of non-deposit on so much thereof as was not deposited promptly in the guardian's account.

In making these computations the status of the account should be segregated into the three periods corresponding with the periods of suretyship by the respective sureties. While the decree will be a single decree fixing the ultimate liability of the deceased guardian's estate it should be so drawn as to fix and recite the state of the accounts during the periods in question so that if it be necessary to take action against any surety hereafter the basis of the liability of such surety will have already been fixed.

As between National Surety Corporation and National Surety Company the agreement filed in this court bound National Surety Corporation to make good defaults of this guardian predicated upon his acts on and after May 1, 1933. The mere entry of a decree after May 1, 1933, is insufficient to establish liability of National Surety Corporation. So, too, the filing of an account after May 1, 1933, is insufficient. So too the failure of the fiduciary to make payment after May 1, 1933, as directed by decree would, standing alone, be insufficient. National Surety Corporation under its contract is chargeable only if in fact at the time it assumed liability there was an estate of this infant in the hands of the guardian. Its liability, if any, is limited to the amount of the estate then in the guardian's hands. It claims to have demonstrated dissipation of the estate of this infant prior to May 1, 1933. Its proof does not go so far. Dissipation and loss of the funds is one thing — misuse of them another. This guardian misused the funds by putting them in his business. In placing them there improperly the guardian did not destroy the estate. He rendered himself liable to surcharge at the legal rate of interest and of course liable personally to insure the safety of the capital of the estate. He could thereafter offer no excuse of loss of principal because, for instance, of failure of a bank wherein the funds were on deposit or shrinkage in value of a lawful investment. By the diversion he made himself an insurer. If in truth he had become absolutely insolvent prior to May 1, 1933, there would have been proof of loss which would absolve National Surety Corporation. The contrary appears here. His estate is not shown to be insolvent. It realized large sums out of the business in which these trust funds were used. To the extent of the corpus actually existent on May 1, 1933 (whether in the savings bank or in the business), the trust estate existed and National Surety Corporation became liable for the safety of it. The principal for which it is thus liable will differ from the actual principal fixed by the decree as the capital of the infant's estate because that capital will include an amount representing disallowed but actually made disbursements for the infant. This last item has been charged to the period wherein Maryland

Casualty Company was surety because the actual disbursement of the funds in that period was a disposal of them which diminished the capital to that extent. Such diminution has been held improper. The surety who assumed the risk during the period of such disposal must, if required, make it good. National Surety Corporation cannot escape its liability for the balance since the employment of that balance in the deceased guardian's business did not result in any different legal situation than if the funds had been in the hands of the guardian in a personal account in his individual name. Each would constitute a diversion but not the destruction or loss of the estate. A deposit of estate funds in an estate bank account makes the estate a creditor of the bank. (*Matter of Holden*, 264 N. Y. 215.) Here the estate was a creditor of the guardian and his firm. The duty to repay these funds was on the guardian after May 1, 1933, and the partnership — because on notice of the source of the funds — was likewise amenable to action to recover them. Their repayment was a continuing obligation of the guardian and his act of continued employment of the funds in the partnership was an act bringing into effect the terms of the contract of assumption of liability by National Surety Corporation.

The fact that National Surety Corporation is liable does not discharge National Surety Company for defaults in the period of its suretyship. The diversion of funds occurred in its suretyship and was continued beyond it. As stated hereinabove there was on March 7, 1929, a cash sum of $7,951.47 in the savings banks in accounts in the name of the guardian. So far as the sum in question sufficed to make good diversions of the infant's estate such deposit, though later withdrawn in large part, constituted restitution by the guardian of prior misuse of the funds. If in the recomputation which will be required it be ascertained that such deposit of March 7, 1929, did not fully restore funds taken out of the estate for personal use by the guardian in the period when National Surety Company was surety it will be accountable for such additional funds as well. It is accountable for all misuse of the deposit of March 7, 1929, from that date down to and including April 30, 1933, when by agreement with National Surety Corporation the latter took over the responsibility. It has been held herein that the act of diversion of the funds and of continuing their use in the private business of the guardian was a continuing act. The fact that such continuance invokes for the benefit of the estate the liability of National Surety Corporation does not effectuate a discharge of National Surety Company. Its agreement of indemnity will not have been discharged until there has been restored to the estate all funds wrongfully misused in its

period of suretyship. The estate is entitled to maintain its claim against National Surety Company irrespective of whether the latter by virtue of its contract with National Surety Corporation may claim recoupment from the latter. Any adjustment of liability due to the terms of the contract between the two sureties does not diminish the right of the estate to be reimbursed by any one who undertook the reimbursement. In the circumstances existing in respect of these funds, responsibility for funds diverted and misused during the suretyship of National Surety Company is a liability of the latter and so far as such diversions were continued into the period of assumption of risk by National Surety Corporation such corporation is also liable.

When the recomputations necessary to conform to the instructions contained in this decision have been made, a decree may be entered settling the account accordingly.