# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 01-1898WA

_____

Wal-Mart Stores, Inc., and National    *
Union Fire Insurance Company of    *
Pittsburgh, Pennsylvania,    *
   *
         Appellants,    *    On Appeal from the United
   *    States District Court
     v.    *    for the Western District
   *    of Arkansas.
   *
RLI Insurance Company,    *
   *
         Appellee.    *

_____

Submitted: January 14, 2002
Filed: June 5, 2002

_____

Before LOKEN, RICHARD S. ARNOLD, and MURPHY, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


This is a dispute between several insurers and an insured. The parties disagree about the interpretation of multiple insurance contracts and an indemnity clause in a vendor agreement. Wal-Mart and its insurer, National Union, brought this action for declaratory judgment in the District Court for the Western District of Arkansas to determine their responsibility for an $11 million products-liability settlement. Wal-Mart and National Union argued that they were protected from liability by an

indemnity clause in the vendor agreement between Wal-Mart and its supplier, Cheyenne, and that RLI Insurance Company, which insured Cheyenne and Wal-Mart, had no claim against them for any part of the settlement.

The District Court ruled against Wal-Mart and National Union. It ordered that they pay RLI, the excess insurer of Cheyenne, $10 million. Two bases underlay this conclusion: first, that the language of the insurance policies governed the allocation of liability for the settlement, not the indemnity agreement between Cheyenne and Wal-Mart; and second, that Wal-Mart's insurance with National Union was underlying insurance under RLI's policy and must be exhausted before RLI is obligated as an excess insurer.

Wal-Mart and National Union appeal the District Court's decision. They argue that the result of the decision is to make a covered insured (Wal-Mart) liable to its own insurer (RLI), in violation of an axiomatic insurance principle. They also assert that the District Court's decision will result in unnecessary and circular litigation, wherein RLI will ultimately still be held liable for the entire settlement because of Cheyenne's promise to indemnify Wal-Mart. We agree with Wal-Mart and National Union and reverse the decision of the District Court. We direct entry of an order granting summary judgment to Wal-Mart and National Union.

I.

This litigation arises out of a sales agreement between Cheyenne and Wal-Mart. Cheyenne distributes halogen lamps. Wal-Mart and Cheyenne entered into a vendor agreement, under which Cheyenne would supply lamps for Wal-Mart to sell at its retail stores. As part of this agreement, Cheyenne promised to indemnify Wal-Mart from any liability resulting from its sales of the lamps. Cheyenne was also required to demonstrate proof of at least $2 million of liability insurance. Cheyenne was covered by two insurance companies. St. Paul was its primary insurer; this

policy had a $1 million limit for products liability. RLI was an excess insurer beyond the St. Paul coverage; this RLI policy had a $10 million limit for products liability. Wal-Mart was a covered insured under both the St. Paul and RLI policies. Additionally, Wal-Mart had its own insurer, National Union, which covered it with a $10 million policy limit.

A lamp, distributed by Cheyenne and purchased at Wal-Mart, allegedly was defective, causing a fire that severely injured a girl named Jasmine Boykin. Her family sued Wal-Mart, Cheyenne, and other parties in a California state court for personal injuries. This "Boykin" litigation was eventually settled for $11 million. All parties agreed that St. Paul was liable for the first $1 million of the settlement. Cheyenne, Wal-Mart, and their insurers disagreed, however, about their respective responsibilities for the remaining $10 million of the settlement. Eventually, RLI paid the $10 million but reserved its right to seek recovery from National Union and Wal-Mart.

Wal-Mart and National Union then brought this declaratory-judgment action to determine whether they owed RLI any portion of the $10 million it had paid in the Boykin settlement. They argued that the vendor agreement, containing the indemnity clause, governed the apportionment of liability between Wal-Mart and Cheyenne's insurers. RLI filed a counterclaim contending that as an excess insurer, it was entitled to contribution from Wal-Mart's insurer, National Union.

Both parties moved for summary judgment. On February 23, 2000, the District Court granted partial summary judgment in favor of RLI. Although it acknowledged that "a contract with an indemnification clause . . . may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy," the Court ruled that the "other insurance" clauses in the RLI and National Union policies made RLI's coverage of Wal-Mart secondary to National Union's coverage. Addendum to Appellant Wal-Mart's Brief (hereinafter "ADD") 19,

quoting Lee R. Russ & Thomas F. Segalla, 15 <u>Couch on Insurance</u> § 219:1, at 219-7 (3d ed. 1999).

A year later, all parties again moved for summary judgment. Wal-Mart and National Union requested reconsideration of the earlier order of the District Court. They also argued the entire settlement should be attributed to Cheyenne's liability, rather than to any wrongdoing by Wal-Mart, which was indemnified by Cheyenne. The District Court rejected these arguments and ruled in favor of RLI. <u>Wal-Mart Stores, Inc. v. RLI Ins. Co.</u>, 163 F. Supp. 2d 1025, 1044 (W.D. Ark. 2001). It determined that the "other insurance" provision in RLI's policy stating that all other coverage must be exhausted before RLI becomes liable was controlling, and that National Union and Wal-Mart were therefore responsible for reimbursing RLI the $10 million it had paid for the settlement. National Union and Wal-Mart appeal this decision.

## II.

We review a district court's grant of summary judgment de novo. <u>Generali/US Branch v. Bierman</u>, 153 F.3d 865, 867 (8th Cir. 1998). The District Court applied Arkansas law to analyze the provisions in the contracts. We do the same.

Insurance policies are contracts, and so, as with any contract, we begin our analysis with the language of the agreements. The pivotal provision in the view of the District Court was the "other insurance" clause in RLI's policy.

> Whenever the insured is covered by other primary, excess or excess-contingent insurance not scheduled on this policy as scheduled underlying insurance this policy shall apply only in excess of, and will not contribute with, such other insurance. This policy shall not be subject to the terms, conditions or limitations of any such other insurance. In

the event of payment under this policy where the insured is covered by such other insurance, we shall be subrogated to all of the insured's rights of recovery against such other insurance.

ADD 16.

The parties agree that Wal-Mart was an "insured" of RLI for purposes of this clause. They also agree that National Union's policy was not scheduled insurance on the RLI policy. This provision states that RLI's policy will apply only in excess of other unscheduled insurance. This is the core of RLI's argument that its policy is excess to Wal-Mart's coverage by National Union.

Before deciding this issue, we must look to the competing "other insurance" clause in National Union's policy that covered Wal-Mart. It states that National Union's insurance was primary unless specified conditions occurred as described in part "B. Excess Insurance." This clause, in relevant part, reads:

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:
. . . 4) That was bought specifically for an Insured.

ADD 7. Wal-Mart and National Union contend that the National Union policy is excess insurance because Cheyenne purchased the RLI policy specifically for Wal-Mart. The District Court rejected this argument. ADD 18. National Union argues that, in so doing, the District Court impermissibly decided a disputed question of fact on a motion for summary judgment.

We find it unnecessary to resolve these issues about the "other insurance" clauses. Even if the RLI policy was not bought specifically for Wal-Mart (and the evidence is in conflict on this point), we hold that RLI is liable for the $10 million

settlement. We reach this conclusion despite the language in RLI's policy, quoted above, that purports to make RLI an excess insurer when an insured, such as Wal-Mart, has other insurance, as it does here with National Union.

In our opinion, on the facts of this case, the indemnity agreement controls the outcome, not the "other insurance" clauses. Three reasons persuade us this is the correct result. First, examination of the relationships between the parties has convinced us that Cheyenne intended to and did make a valid promise to indemnify Wal-Mart for claims arising from the halogen lamps, and that RLI provided liability insurance to Cheyenne that covers both the Boykin settlement and Cheyenne's indemnification obligation. In this situation we think consideration of the indemnity agreement reflects the intention of the parties and does not unfairly prejudice the insurers. Second, we believe that to make Wal-Mart, an insured of RLI, liable to its insurer, RLI, for the settlement would turn the nature of insurance on its head and violate the principle that insureds cannot be liable to insurers for covered losses. Third, we conclude that to make Wal-Mart or National Union liable to RLI would simply be the first step in a circular chain of litigation that ultimately would end with RLI still having to pay the $10 million. To avoid these results, we hold that Wal-Mart and National Union have no obligation to RLI for any part of the $10 million settlement.

We begin our analysis with the language of the indemnity provisions. Cheyenne agreed to indemnify Wal-Mart at the outset of their contractual relationship. The contract contained two broad indemnity clauses.

> [Cheyenne] shall protect, defend, hold harmless and indemnify [Wal-Mart] from and against any and all claims [and] actions . . . or arising out of any actual or alleged death or of injury to any person . . . or other damage or loss, by whomsoever suffered, resulting or claimed to

result in whole or in part from any actual or alleged defect in such merchandise . . ..

Indemnification; [Cheyenne] agrees to save [Wal-Mart] . . . harmless and indemnified from all claims, liability, loss, damage and expense, including reasonable attorneys' fees, sustained from the purchase, use o[r] sale of any goods or from the breach of any of the guaranties or warranties hereunder . . . and such obligations shall survive acceptance of the goods and payments therefor by [Wal-Mart].

ADD 2.

The language of the provisions is clear. Cheyenne has promised to indemnify Wal-Mart for any liability or loss resulting from Wal-Mart's sale of its lamps. A judgment against Wal-Mart to pay the Boykin settlement is a liability to Wal-Mart resulting from its sale of Cheyenne's goods. RLI argues that the indemnity clause is ineffective to cover Wal-Mart's own negligence because such an obligation is not clearly and unequivocally expressed as required by Arkansas law.

We are not persuaded. The indemnity provisions are very broad and state that Cheyenne will indemnify Wal-Mart for claims resulting *"in whole or in part"* from any actual or alleged defect in the lamps. The Boykin settlement met this criterion; plaintiffs alleged that design flaws in the lamp resulted in its explosion. Any possible negligence by Wal-Mart does not protect Cheyenne from its contractual promise to indemnify Wal-Mart. Therefore, if Wal-Mart is liable to RLI to reimburse it for the Boykin settlement, Wal-Mart would have the right to sue Cheyenne and be indemnified for that amount. Subrogated to Wal-Mart's right, National Union could also sue Cheyenne to enforce the indemnity agreement if found liable to RLI for the Boykin settlement. The indemnity agreement squarely applies to obligate Cheyenne

to protect Wal-Mart and National Union from liability arising from the Boykin settlement.

Notwithstanding Cheyenne's obligation, RLI urges this Court that the indemnification provision is irrelevant to this case. It contends that only the language of insurance policies determine the priority of payment between insurers. We reject this argument. "[C]ourts will assess whether the factual circumstances 'create [ ] a relationship between the indemnity contract and the insurance allocation issues . . . .'" Travelers Cas. & Surety Co. v. Am. Equity Ins. Co., 93 Cal. App. 4th 1142, 1154, 113 Cal. Rptr. 2d 613, 621 (2001) (quoting Maryland Cas. Co. v. Nationwide Mutual Ins. Co., 81 Cal. App. 4th 1082, 1092, 97 Cal. Rptr. 2d 374, 380 (2000)). We find no authority for the proposition that a court may never consider an indemnity clause in determining liability for a settlement. We reject this bright-line approach.

This is not to say, however, that indemnity agreements always govern insurance-allocation issues. RLI cites a case in which, on facts similar to these, the indemnity agreement was not given effect. See Reliance Nat'l Indem. Co. v. General Star Indem. Co, 72 Cal. App. 4th 1063, 85 Cal. Rptr. 2d 627 (1999). However, there are many more cases ruling that indemnity agreements determine the allocation of liability in an insurance dispute. See Rossmoor Sanitation, Inc. v. Pylon, Inc., 13 Cal.3d 622, 532 P.2d 97 (1975). A leading commentator summarizes this situation by observing that "an indemnity agreement between the insureds or a contract with an indemnification clause . . . may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." 15 Couch on Insurance, *supra*, § 219:1, at 219-7. Our task is to determine if the present dispute should fall into this category.

As explained above, whether an indemnity agreement is relevant turns on the particular facts of the case, such as the intentions and relationships of the parties. Because the indemnification agreement creates rights in Wal-Mart and National

Union to recover money paid in the settlement, the relationship between the indemnity contract and the insurance-allocation issues makes consideration of the indemnity contract necessary to resolve the dispute. When we analyze the parties' obligations under both the insurance contracts and the indemnity agreement, we conclude that the indemnity agreement controls the outcome of this case. We shall try to explain why we think this, and how a different result would not give complete relief to the plaintiffs and would cause circuitous litigation.

National Union and Wal-Mart point this Court to cases from several jurisdictions[1] holding that an indemnity agreement prevents the indemnitee's insurer from being liable for a settlement arising from a covered loss. Our own Court has recently reached this conclusion in Continental Cas. Co. v. Auto-Owners Ins. Co., 238 F.3d 941 (8th Cir. 2000) (applying Minnesota law). There, a dispute arose between multiple insurers about how to allocate liability for a settlement from an accident that occurred during a railroad salvage project. The insureds (Fitzsimmons and Burlington Northern) were not parties to the case, but had signed an indemnity agreement in which Fitzsimmons, the salvage company, agreed to indemnify Burlington Northern. The Court considered the indemnity clause because it noted that the provision allowed Burlington Northern's insurer, "Interstate, being subrogated to Burlington Northern's rights, [to] reach Fitzsimmons and, through it, Fitzsimmon's CGL carrier, Auto-Owners." Id. at 945. Based on this chain of relationships, we held that "Auto-Owners is obligated to bear the entire loss, and not, as the district court concluded, just a portion of it." Id. We reached this result notwithstanding the fact that Interstate's policy covered the loss at issue.

_____

[1]The parties agree that Arkansas law governs. The parties have nevertheless cited mainly cases from other jurisdictions, apparently on the theory (which we have no reason to question) that these cases rest on general principles of insurance law which the Supreme Court of Arkansas would apply.

We think this case provides strong support for our conclusion that RLI must bear the entire loss for the Boykin settlement. First, we note that although the insureds were not parties in <u>Continental</u>, the Court nonetheless considered the indemnity agreement. "The present action . . . is founded not just on the insurance policies but also on the agreements between" the insureds, which contained an indemnity provision. <u>Id.</u> at 945. This fact defeats RLI's argument that consideration of the indemnity agreement is inappropriate because Cheyenne was not successfully brought into this suit. Indeed, there is a greater reason to consider the indemnity agreement in this case since Wal-Mart, one of the parties to the vendor contract, is a party and bases its declaratory-judgement action on the indemnity agreement.

The <u>Continental</u> Court also noted that the contract between the insureds required the insurance arrangements. This also is true in the instant case. The vendor agreement required Cheyenne to obtain $2 million in insurance. The St. Paul policy satisfied $1 million of this obligation. The RLI policy satisfied the remaining $1 million, and in fact, went further, since it provides $9 million in additional coverage. Although the RLI policy may not have been bought "specifically" for Wal-Mart, it nevertheless satisfied the requirements of the vendor contract. There is thus a close factual relationship between the indemnity obligation and the insurance contracts.

In a suit between two insurers with identical and dueling "other insurance" clauses, the indemnity agreement was held to be paramount. <u>Chubb Insurance Co. of Canada v. Mid-Continent Cas. Co.</u>, 982 F. Supp. 435, 438 (S.D. Miss. 1997). The court explained:

> [T]o the extent that Smith Brothers [the indemnitor] is liable to Coho [the indemnitee] for indemnity, so, too, are its insurers, to the extent that their policies provide coverage for Smith Brothers' indemnity liability. To hold otherwise would render the indemnity contract between the insureds completely ineffectual and would obviously not

be a correct result, for it is the parties' rights and liabilities to each other which determine the insurance coverage; the insurance coverage does not define the parties' rights and liabilities one to the another.

Id. Therefore, the court made the indemnitor's insurer bear the entire loss, despite its "other insurance" clause that provided for allocation with other applicable insurance.

A similar logic underlay the result in J. Walters Constr. Inc. v. Gilman Paper Co., 620 So. 2d 219 (Fla. App. 1993). In that case, a contract required a construction company to obtain insurance and to indemnify the owner of the building. When an accident occurred and a lawsuit was brought and settled, the owner sued to enforce the indemnification provision against the construction company and its insurer. They defended by arguing that because the indemnitee also had insurance that could cover the claim, the indemnitor's insurer should be liable only for part of the settlement. The court rejected this argument, holding that "to apply the 'other insurance' provisions to reduce [the indemnitor's insurer's liability] would serve to abrogate the indemnity agreement between" the construction company and the building owner. Id. at 221. See also Aetna Ins. Co. v. Fid. & Cas. Co. of New York, 483 F.2d 471, 473 (5th Cir. 1973) (indemnity agreement "controls all the rights and obligations of the parties and their privies (the insurers)").

RLI contends that none of these cases is apposite because they deal with two insurers on the same level (i.e., both primary) suing on claims for contribution or allocation, and RLI characterizes the present dispute as arising between an excess insurer (itself) and a primary insurer (National Union). We reject RLI's contention. The above-discussed cases are disputes about whether indemnity agreements relieve particular insurers of an obligation to pay. This is the heart of what this suit is about. It is a declaratory-judgment action by Wal-Mart and National Union seeking a determination that the indemnity agreement prevents them from being liable. Whether the parties are termed "primary" or "excess" depends on who is required to

pay first, and that is the question presented here. The answer to this question, however, depends on the indemnity agreement because of its effect on the obligations of the parties. In this situation, RLI cannot avoid liability for the settlement by pointing to language in its policy calling itself "excess." RLI is "excess" to National Union only if we determine that National Union is liable first, and, as explained above, we do not do so because we believe the indemnity agreement governs.

RLI strenuously urges this court to adopt the approach of Reliance Nat'l Indem. Co. v. General Star Indem. Co., 72 Cal. App. 4th 1063, 85 Cal. Rptr. 2d 627 (1999). It contends that this case is the most persuasive because it deals with a dispute between a primary and an excess insurer. The dispute in Reliance arose when an audience member was injured at a Lollapalooza performance. Lollapalooza entered into a contract with Don Law to do a concert in Rhode Island. The contract required Don Law to indemnify and hold Lollapalooza harmless for personal injuries and to purchase liability insurance naming Lollapalooza as an insured. Don Law had a primary policy with Gulf Insurance and an excess policy with General Star Insurance. Lollapalooza was named as an additional insured under both policies. It also had its own insurance with Reliance Company. The suit by the audience member was settled for $2 million with partial funding by Gulf, General Star, and Reliance.

In a suit to allocate final responsibility for the settlement, Reliance argued that Don Law's indemnity obligation to Lollapalooza relieved Reliance, as Lollapalooza's insurer, of any obligation for the settlement. The court disagreed. It held that General Star was not required to contribute to the settlement because it was an excess insurer who need not pay until all primary insurance was exhausted, notwithstanding Don Law's promise to indemnify Lollapalooza. So here, according to RLI, its obligation does not come into play until Wal-Mart's own insurance with National Union has been exhausted.

-12-

We do not believe that Arkansas would adopt the approach of <u>Reliance</u> to resolve this case.  First, as we shall explain, <u>Reliance</u> seems to be the minority position and is in apparent conflict with a California Supreme Court case.  Second, we do not think the <u>Reliance</u> approach would comport with the equities in this case or lead to a fair or efficient resolution of this dispute.  For these reasons, we respectfully disagree that <u>Reliance</u> governs this case.

The District Court cited only <u>Reliance</u> to support its resolution of the case, and it seems to be the only relevant case that uses the approach urged by RLI.  In the other cases cited by RLI, the insureds were not bound by an indemnity agreement.  See <u>Universal Underwriters Ins. Co. v. CNA Ins. Co.</u>, 308 N.J. Super. 415, 706 A.2d 217 (1998); <u>Continental Cas. Co. v. Pacific Indem. Co.</u>, 134 Cal. App. 3d 389, 184 Cal. Rptr. 583 (1982).  These cases are not relevant in determining the effect that should be given to the indemnity clause that does exist in this case.  <u>Reliance</u> is in the minority.  We doubt that Arkansas would follow its reasoning, in light of the numerous cases that do consider indemnity agreements along with insurance policies in resolving allocation disputes.

We also hesitate to follow <u>Reliance</u>, a California intermediate appellate case, because we do not think its result fully accords with a California Supreme Court case, <u>Rossmoor Sanitation, Inc. v. Pylon, Inc.</u>, 13 Cal.3d 622, 532 P.2d 97 (1975).  In <u>Rossmoor</u>, the plaintiff contracted with Pylon to build a sewage pump station.  <u>Id.</u> at 98.  The contract specified that Pylon would indemnify Rossmoor against all claims arising out of the construction and that Pylon would obtain insurance and name Rossmoor as an additional insured.  Pylon obtained coverage under U.S. Fire.  Rossmoor also had independent coverage with INA.  Both the U.S. Fire and INA policies had "other insurance" clauses stating that apportionment was required if an insured had other insurance for a covered loss.  <u>Id.</u> at 699.  An accident occurred, harming two Pylon employees.  They brought suit and won a judgment, which was satisfied by Rossmoor's independent insurer, INA.  Rossmoor then brought a

declaratory-judgment action against Pylon and U.S. Fire seeking indemnity for the money paid. Id.

The California Supreme Court ruled in favor Rossmoor and held that Pylon and U.S. Fire were obligated to reimburse Rossmoor for its loss. Determining that the indemnity clause covered the accident, the court noted that INA could enforce the indemnity promise against Pylon as a subrogee of Rossmoor's rights. Id. at 104-05. In so doing, the court rejected Pylon's and U.S. Fire's argument that it was unfair to ignore the terms of the insurance policies and consider the indemnity clause. "It appears that both INA and U.S. Fire calculated and accepted premiums with knowledge that they might be called upon to satisfy a full judgment. There is no evidence that either company knew there was or would be other insurance when they issued the policies." Id. The court also noted that to hold otherwise would deny Rossmoor the benefit of its indemnity agreement, an inequitable result.

Rossmoor was argued to the Reliance court, but it held the case did not bind the court on the facts of Reliance. Reliance, 85 Cal. Rptr. 2d at 639. The Reliance court distinguished Rossmoor as a case between what it termed two "primary" insurers, while it categorized Reliance as a dispute between a "primary" and an "excess" insurer. Id. It reasoned that to hold the indemnitor's "excess" insurer liable first, before calling upon the indemnitee's insurer, would allow the indemnitee's primary insurer to "shift the loss to an excess carrier which charged a lower premium." Id.

We are unconvinced that an indemnitee loses its ability to have the effect of an indemnity contract considered in an insurance-allocation dispute because of how the insurers characterize themselves in the abstract. As we explained above, the labels "primary" and "excess" are shorthand for priority of payment obligations. In our case, we agree that RLI explicitly made itself "excess" to St. Paul. The RLI policy specifically referenced the St. Paul policy. We fail to see why RLI deserves the

-14-

benefit of being "excess" to National Union, an insurer it knew nothing about.  We think the Reliance court's efforts at escaping the holding of Rossmoor are unpersuasive.  We read Rossmoor to stand for the proposition that, when an indemnity agreement is put at issue by a party in an insurance-allocation dispute, the effect and purpose of such an indemnity agreement may govern the allocation of liability, despite policy language that would require a different result.  On this reading, we think Rossmoor should have been controlling in the Reliance case.  More importantly, we believe Rossmoor is better reasoned than Reliance and would be followed by Arkansas courts.

The terms of the policies at issue in Reliance and in the case at hand also differ.  In Reliance, the indemnitor's insurer had a clause in its policy that specified that "[n]othing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance, reinsurance or *indemnity*."  Id. at 637-38. (emphasis added).  RLI does not point out any such exclusion in its policy.  The RLI policy covered Cheyenne for contractual liability, without specific exclusion for indemnity provisions.  We think this, too, makes Reliance unpersuasive authority for the present case.

Courts consider the equities in resolving insurance-allocation disputes.  See United States Fid. & Guaranty Co. v. Aetna Cas. & Surety Co., 418 F.2d 953, 956 (8th Cir. 1969 ("[i]t is settled law in Arkansas . . . that contribution is founded upon principles of equity and that relief is granted only where the equities are equal."); Welch Foods, Inc. v. Chicago Title Ins. Co., 341 Ark. 515, 519, 17 S.W.3d 467, 470 (2000) ("Subrogation is a doctrine steeped in equity and generally governed by equitable principles.")  In this case, the equities do not tip the balance in favor of RLI.  Although RLI contends that it would be unfair to make it, an "excess" insurer, liable, while allowing National Union, a "primary" insurer, to avoid paying any part of the settlement, we note that RLI calculated its premiums relying only on the primary insurance of St. Paul.  RLI has received the benefit of the St. Paul policy, which

-15-

covered the first $1 million of the Boykin settlement. RLI has introduced no evidence that it knew whether Wal-Mart had other insurance to cover liability from the sales of the halogen lamps, or the extent of any such coverage.

On the other hand, Wal-Mart has an equitable argument in its favor. Wal-Mart's purpose in obtaining a promise from Cheyenne to indemnify it was to avoid liability for any claims arising out of its retail sales of Cheyenne's halogen lamps. The District Court entered an order making Wal-Mart jointly and severally liable to RLI for $10 million for a loss that arose out of Wal-Mart's sale of Cheyenne's merchandise. It is exactly to avoid liability for suits like that brought by the Boykin plaintiffs that Wal-Mart negotiated the indemnification provision with Cheyenne. We think that Wal-Mart deserves the benefit of its contractual bargain with Cheyenne, that is, not to be liable for claims stemming from its sales of Cheyenne's lamps. See Rossmoor, 13 Cal.3d 622, 634, 532 P.2d 97, 104-05 (noting that to make indemnitee's insurer liable "would effectively negate the indemnity agreement and impose liability on [indemnitee's insurer] when [indemnitee] bargained with [indemnitor] to avoid that very result as part of the consideration for the construction agreement").

We have identified two other persuasive reasons to reverse the judgment of the District Court. First, to make Wal-Mart liable to RLI would violate a basic principle of insurance: that an insured cannot be liable to an insurer for a covered loss. Second, the District Court's resolution of the case would lead to circular litigation that would ultimately place the parties back in the positions they were in at the filing of this suit.

Wal-Mart directs this Court's attention to the anti-subrogation rule, which prevents an insurer from taking on one of its insured's rights in order to recover from another insured for a covered loss. See Maryland Cas. Co. v. Nationwide Ins. Co., 692 N.Y.S.2d 154, 155 (App. Div. 1999); 16 Couch on Insurance, supra, § 224:2, at 224-17. Wal-Mart argues that although RLI does not specify its theory of recovery,

the general purpose of the anti-subrogation rule would still be violated if Wal-Mart is made liable to RLI. We agree. To make Wal-Mart liable to RLI defeats the purpose of Wal-Mart's being insured by RLI. It would leave Wal-Mart liable for the Boykin settlement, which arose from a covered event under the RLI policy, which listed Wal-Mart as an insured. Such a result would be startling, to say the least. Generally, insureds may not be made liable to their insurers for covered losses. See Industrial Indem. Co. v. Beeson, 132 Ariz. 503, 506, 647 P.2d 634, 637 (Ariz. App. 1982) (disallowing insurer from bringing subrogation action because to do so would be "tantamount to permitting an insurer to recover from its own insureds for the very risk insured against"). Accord, Dalrymple v. Royal-Globe Ins. Co., 280 Ark. 514, 659 S.W.2d 938 (1983).

Finally, we believe the District Court's result was incorrect because it would produce circuitous litigation that would still result in RLI being ultimately liable for the $10 million. This could occur in two ways, depending on whether Wal-Mart or National Union satisfied the judgment for which the District Court made them jointly liable. If Wal-Mart paid the judgment, it would sue Cheyenne to enforce the indemnity provisions in their vendor agreement. As discussed above, Wal-Mart would win this suit and obtain a judgment against Cheyenne. Cheyenne would then look to its insurer, RLI, to cover this loss because the policy covers contractual indemnity liability. The end result would be that RLI would have to pay out $10 million. A similar course of events would occur if National Union satisfied the judgment, except that it would step into Wal-Mart's shoes and bring a subrogation action against Cheyenne asserting Wal-Mart's contractual right to indemnification.

Under either scenario, two ultimate results would occur, neither of which we think is permissible. If Cheyenne ended up paying Wal-Mart or National Union, RLI would have accomplished indirectly what it could not accomplish directly. It would have made its insured liable to itself, an insurer, for a covered loss. We have already explained why this result is illogical and unfair to the insured, who paid premiums to

its insurer exactly to avoid liability for these claims. To allow Cheyenne to be liable would prevent Cheyenne from receiving the benefit of its insurance policy with RLI. If Cheyenne succeeded in getting RLI to cover the $10 million claim resulting from the enforcement of the indemnity provisions, the parties would be back in the situation they were in before this action was brought—RLI is liable for the $10 million Boykin settlement. The District Court recognized this result as likely but did not use it as a factor in its decision. ADD 19 n.6.

We think this was error. Generally, courts will not allow parties to engage in circuitous action when the foreseeable end result is to put the parties back in the same position in which they began. In Maryland Cas. Co. v. Employers Mut. Liab. Ins. Co. of Wisconsin, 208 F.2d 731 (2d Cir. 1953), Judge Learned Hand reasoned that "complete circuity of action" was a valid defense to a judgment in an insurance action. Id. at 733. There, Maryland Casualty Company paid a settlement on a lawsuit arising from a covered claim. It then sued the defendant insurance company for contribution on the basis of the "other insurance" clauses in both policies. Judge Hand reasoned that to allow Maryland Casualty Company to recover any part of the settlement it paid from the defendant insurance company was error, because the defendant insurance company, subrogated to the rights of the insured, could have then brought suit and recovered against Maryland Casualty Company. Because the litigation was clearly circular and would not ultimately change the parties' obligations from their pre-suit positions, Maryland Casualty was barred from recovery. See also Pacific Nat'l Ins. Co. v. Transport Ins. Co., 341 F.2d 514, 518 (8th Cir.), cert. denied, 381 U.S. 912 (1965) (policy against allowing such litigation "prevents a multiplicity of suits and holds the insurer liable who by a circuity of actions would eventually be obligated") (quoting Travelers Ins. Co. v. General Cas. Co., 187 F. Supp. 234, 236 (E.D. Idaho 1960)).

We think this potential circuity of action is significant, in that it reveals the true nature of the parties' obligations and relationships with each other. RLI will

ultimately be liable for the $10 million because of Cheyenne's promise to indemnify Wal-Mart and RLI's contractual-liability coverage in its policy covering Cheyenne. To prevent such wasteful litigation and to give effect to the indemnification agreement between the parties, we hold that RLI cannot recover against National Union or Wal-Mart. We reverse the District Court's decision to the contrary.

III.

Accordingly, the judgment is reversed. We direct entry of an order granting summary judgment to Wal-Mart and National Union.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.