# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 10, 2014         Decided July 18, 2014

No. 13-7024

INTERSTATE FIRE & CASUALTY COMPANY,
APPELLEE

v.

WASHINGTON HOSPITAL CENTER CORPORATION, DOING
BUSINESS AS WASHINGTON HOSPITAL CENTER,
APPELLEE

GREENSPRING FINANCIAL INSURANCE LIMITED,
APPELLANT

MEDSTAR HEALTH, INC.,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01193)

———

*Linda S. Woolf* argued the cause for appellant. With her on
the briefs was *Joseph B. Wolf*.

*Paulette S. Sarp* argued the cause for appellee Interstate
Fire and Casualty Company. With her on the brief was *David
Hudgins*.

Before: GRIFFITH, KAVANAUGH and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: In 2003, Greenspring Financial Insurance Limited, Inc., issued an insurance policy providing coverage to employees of Washington Hospital Center for claims arising out of medical incidents within the scope of their employment. The central question in this case is whether a nurse hired by a staffing agency and assigned to work at the hospital on a temporary basis was a covered "employee" under the policy. The district court concluded that the nurse qualified as an employee of Washington Hospital for purposes of the Greenspring policy. The court therefore ordered Greenspring to pay the cost of defending and settling medical malpractice claims against the nurse. We agree with the district court's construction of the Greenspring policy, and we see no grounds for excusing Greenspring from its obligations under the insurance contract.

I.

In February 2002, Washington Hospital Center and Progressive Nursing Staffers, Inc., entered into a staffing agreement under which Progressive agreed to provide registered nurses to the hospital for long-term and per-diem assignments. Washington Hospital retained the right to terminate the assignment of any Progressive nurse who failed to meet the hospital's reasonable expectations or failed to follow the hospital's patient care policies. Washington Hospital and Progressive also agreed that each would indemnify the other for "any and all claims and expenses arising out of or resulting from the . . . negligent acts . . . of its employees or agents."

Washington Hospital is a wholly owned subsidiary of MedStar Health, Inc., which owns and operates several other medical facilities in Maryland and the District of Columbia. Greenspring Financial Insurance Limited, Inc., is also a wholly owned subsidiary of MedStar and is MedStar's "captive insurer." *See Clougherty Packing Co. v. Comm'r*, 811 F.2d 1297, 1298 n.1 (9th Cir. 1987) (a captive insurer is "a corporation organized for the purpose of insuring the liabilities of its owner"). In August 2003, Greenspring issued a general liability policy to MedStar under which Greenspring must indemnify the "Insured" for damages of up to $5 million per incident resulting from covered medical incidents. The policy defines "Insured" to include "all past, present, or future full-time or part-time Employees" of MedStar, including employees of MedStar subsidiaries such as Washington Hospital. The Greenspring policy also includes an "other insurance" clause—i.e., a clause apportioning liability in the event multiple insurance policies cover the same risk. The clause states that "[t]he insurance afforded by this policy is primary insurance" except when otherwise specified.

Another insurer, Interstate Fire and Casualty Co., issued a professional liability policy covering Progressive and its current and former employees for claims made between November 2006 and November 2007, with a cap of $1 million per incident. The policy includes an "other insurance" clause which states that, "[i]f there is other valid insurance (whether primary, excess, contingent or self-insurance) which may apply against a loss or claim covered by this policy, the insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance." Interstate Fire simultaneously issued an excess commercial liability policy to Progressive which covers Progressive and its current and former employees for up to $4 million per incident. The policy also

applies "as excess of and not contributory with" any primary or other insurance.

Chichio Hand, a registered nurse, was hired by Progressive in 1999 and later assigned to work at Washington Hospital. In April 2004, Nurse Hand was one of several medical professionals at Washington Hospital involved in the treatment of Radianne Banks. Ms. Banks, who had been admitted to Washington Hospital while pregnant with her first child, underwent a caesarean section and could not move her legs afterward. In March 2007, she sued Washington Hospital and two of its doctors in D.C. Superior Court for negligence, alleging that she became completely wheelchair-bound as a result of injuries she sustained at the hospital. In June 2008, Washington Hospital filed a third-party complaint in the Banks action seeking indemnification and contribution from Nurse Hand and Progressive. Nurse Hand and Progressive then filed a fourth-party complaint against Washington Hospital and one of its doctors, likewise seeking indemnification and contribution.

In August 2009, Ms. Banks, Washington Hospital, Nurse Hand, Progressive, and Interstate Fire entered into a settlement agreement resolving their respective claims. Washington Hospital agreed to pay Ms. Banks and her attorneys $1.05 million, while Interstate Fire agreed to pay $3.055 million, consisting of a $1.455 million payment to Ms. Banks and her attorneys as well as the purchase of two annuities for Ms. Banks at a combined cost of $1.6 million. Significantly, Interstate Fire "expressly reserv[ed] the right to rely on the 'other insurance' clauses incorporated into its policies to seek reallocation of the settlement as may be warranted."

In July 2010, Interstate Fire followed through on its reservation. It sued Washington Hospital, MedStar, and

Greenspring in federal district court, alleging that the defendants owed a duty under the Greenspring general liability policy to provide primary insurance coverage for Nurse Hand. Interstate Fire asserted that it "stands in the shoes" of Nurse Hand and Progressive for purposes of the litigation, and it sought damages equal to all legal fees and costs it had paid on behalf of Nurse Hand and Progressive. The complaint invoked the district court's diversity jurisdiction. 28 U.S.C. § 1332.

The parties filed cross motions for summary judgment, and the district court issued an initial decision in March 2012. *See Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.*, 853 F. Supp. 2d 49 (D.D.C. 2012) (*Interstate Fire I*). The court held that Nurse Hand is an "employee" of Washington Hospital for purposes of the Greenspring policy, and that Nurse Hand thus qualifies as a person insured under that policy. Next, the court rejected the defendants' argument that the staffing agreement between Washington Hospital and Progressive requires Progressive's insurer, Interstate Fire, to indemnify Washington Hospital for any liability arising out of the actions of Progressive's nurses. The court held that Washington Hospital had waived its right to indemnification when it released its claims against Progressive and Interstate Fire in the settlement of the Banks litigation. The court then examined the "other insurance" clauses in the various insurance policies and determined that Greenspring's coverage of Nurse Hand is primary. The court therefore granted partial summary judgment to Interstate Fire with regard to Greenspring's liability. In a subsequent decision, the court ruled that Interstate Fire was entitled to recover $3.055 million from Greenspring for payments under the settlement agreement and $153,248.72 for attorneys' fees and costs, along with pre-judgment and post-judgment interest. *See Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.*, 917 F. Supp. 2d 87 (D.D.C. 2013) (*Interstate Fire II*). Greenspring appeals.

6

II.

We review the district court's grant of summary judgment de novo. *See United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1318 (D.C. Cir. 2014). The parties agree that the District of Columbia's substantive law applies, and we follow the decisions of the District of Columbia Court of Appeals with respect to local law. *See Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1105, 1107 n.4 (D.C. Cir. 2012). Until February 1, 1971, judgments of the District of Columbia courts were subject to review by this court, and D.C. Circuit decisions from before that date are binding as to local law. *See Hemphill v. Wash. Metro. Area Transit Auth.*, 982 F.2d 572, 574 & n.1 (D.C. Cir. 1993); *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). When local law is "silent," the common law of Maryland is "'especially persuasive authority,'" as Maryland law is historically "'the source of the District's common law.'" *TMG II v. United States*, 1 F.3d 36, 41 (D.C. Cir. 1993) (quoting *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983)).

A.

The principal issue in this case is whether Nurse Hand, who was hired by a staffing agency (Progressive) and assigned to work at Washington Hospital, qualifies as an "employee" of the hospital. If so, Nurse Hand is an insured under the Greenspring policy, implicating Greenspring's primary coverage. It is undisputed that Nurse Hand is also an employee of Progressive. But "[g]enerally, a person may be the employee of two employers" as long as "'the service to one does not involve abandonment of the service to the other.'" *Zinn v. McKune*, 143 F.3d 1353, 1361 (10th Cir. 1998) (quoting Restatement (2d) of Agency § 226 (1958)); *see Lovelace v. Anderson*, 785 A.2d 726, 741 (Md. 2001). The fact that only Progressive paid a salary to Nurse Hand does not preclude a finding that she is an employee

of both Progressive and the hospital. *See Beegle v. Rest. Mgmt., Inc.*, 679 A.2d 480, 485 (D.C. 1996) (issue of "who paid [the worker]'s salary" is "not an adequate basis upon which to determine the relationships of the parties," and trial court erred in treating payment of salary as "decisive factor" in determining whether employment relationship exists).

Because an insurance policy is a contract, we construe it according to contract law principles. *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002). "'Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous.'" *Sears v. Catholic Archdiocese of Wash.*, 5 A.3d 653, 661 n.15 (D.C. 2010) (quoting *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984)). "'In determining whether a contract is ambiguous, we examine the document on its face, giving the language used its plain meaning,' unless, in context, it is evident that the terms used have a technical or specialized meaning." *Beck v. Cont'l Cas. Co. (In re May)*, 936 A.2d 747, 751 (D.C. 2007) (citation omitted) (quoting *Tillery v. Dist. of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)). We deal here with an insurance contract, and the "first step" in the construction of an insurance contract is "to determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Travelers Indem. Co. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001) (internal quotation marks omitted). In conducting that inquiry, District of Columbia courts routinely consult dictionary definitions of disputed terms. *See, e.g.*, *Hartford Fin. Servs. Grp. v. Hand*, 30 A.3d 180, 187 n.13 (D.C. 2011) (consulting *Black's Law Dictionary*); *Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1128 n.2 (D.C. 2001) (*Webster's International Dictionary*); *In re Estate of Corriea*, 719 A.2d 1234, 1242-43 (D.C. 1998) (*Webster's Ninth New Collegiate*, *Black's Law*, and *American Heritage Dictionary*).

The disputed term in this case is the word "employee" in the Greenspring policy. The *American Heritage Dictionary* defines "employee" as a "person who works for another in return for financial or other compensation." *The American Heritage Dictionary of the English Language* (5th ed. online 2014). *Webster's* defines "employee" as "one employed by another usually in a position below the executive level and usually for wages." *Webster's Third New International Dictionary, Unabridged* (online ed. 2014). Those definitions do not squarely address whether an individual hired by a staffing agency and assigned to work for another firm is an "employee" of the latter.

The definition of "employee" in *Black's Law Dictionary* speaks to the question more directly. *Black's Law* defines "employee" as a "person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." *Black's Law Dictionary* 602 (9th ed. 2009). Beneath the definition of "employee" and in indented text, *Black's Law* also includes a definition for "borrowed employee": an "employee whose services are, with the employee's consent, lent to another employer who temporarily assumes control over the employee's work." *Id.* Greenspring acknowledges that the staffing agreement gave Washington Hospital the right to control the details of Nurse Hand's work performance. Greenspring also acknowledges that Nurse Hand was in fact under the hospital's control at the time of the conduct causing Ms. Banks's injuries. According to the *Black's Law* definition, then, Nurse Hand qualifies as an "employee" of Washington Hospital—and, more specifically, a "borrowed employee" of the hospital.

We acknowledge that legal dictionaries such as *Black's Law* sometimes supply specialized definitions.  But we have found *Black's Law* definitions to be helpful in construing insurance policies under District of Columbia law.  *E.g.*, *Essex Ins. Co. v. Doe*, 511 F.3d 198, 200 (D.C. Cir. 2008).  And District of Columbia courts routinely rely on *Black's Law* definitions in the insurance context.  *See Hand*, 30 A.3d at 187 n.13; *Estate of Corriea*, 719 A.2d at 1242; *Riggs v. Aetna Ins. Co.*, 454 A.2d 818, 821 (D.C. 1983); *McIntosh v. Aetna Life Ins. Co.*, 268 A.2d 518, 520 (D.C. 1970).  We follow that course here.

Greenspring, for its part, argues that the definition of "employee" in its policy includes only "full-time" and "part-time" employees rather than "all" employees.  Appellant's Br. 18 (emphasis omitted).  In Greenspring's view, some workers qualify as "employees" but are neither "full-time" nor "part-time."  But the adjective "full-time" is defined as "employed for or working the amount of time considered customary or standard," while "part-time" is defined as "employed for or working less than the amount of time considered customary or standard."  *Webster's Third New International Dictionary*, *supra*; *see also American Heritage Dictionary*, *supra* (defining "full-time" as "[e]mployed for or involving a standard number of hours of working time" and "part-time" as "[f]or or during less than the customary or standard time").  It would seem, then, that all employees fall into either the "full-time" or "part-time" category (except perhaps for a category of employees who work *more* than the standard amount of time, and Greenspring does not argue that Nurse Hand falls into such a category).  In any event, there is no reason to suppose that the expansive language in the Greenspring policy ("*all* past, present, or future full-time or part-time Employees") was intended to limit the scope of the term "employee."  If anything, the policy's definition of "employee" yields the opposite effect.

Greenspring instead urges us to construe the terms "full-time" and "part-time" in light of the definitions used by federal agencies for statistical purposes. *See, e.g.*, U.S. Dep't of Labor, Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey: Labor Force Characteristics*, http://bls.gov/cps/lfcharacteristics.htm (last updated Apr. 25, 2014) ("full time" employment is "35 hours or more per week"; "part time" employment is "1 to 34 hours per week"). It is far from clear how the Bureau of Labor Statistics definitions—even if applicable—would advance Greenspring's cause. If Nurse Hand worked 35 hours or more per week, she would be a "full-time" employee; if she worked one to 34 hours per week, she would be a "part-time" employee. In either event, she would be an "employee." Greenspring, at any rate, cites no case in which a District of Columbia court has used a Bureau of Labor Statistics website to construe a term in an insurance policy, much less any insurance case in which a court adhered to a Bureau definition to the exclusion of *Black's Law Dictionary*, *Webster's*, and *American Heritage*.

Greenspring also cites decisions from other jurisdictions construing insurance policies with definitions of "employee" that refer to "leased workers" and "temporary workers," terms that do not appear in the Greenspring policy. The policies cited by Greenspring all state that the term "employee" includes a "leased worker" but not a "temporary worker." *See, e.g.*, *Wellington Specialty Ins. Co. v. Kendall Crane Serv.*, 434 F. App'x 794, 795-96 (11th Cir. 2011) (per curiam) (quoting policy language); *Key Constr., Inc. v. Colony Ins. Co.*, No. 3-10-CV-0297-BD, 2011 U.S. Dist. LEXIS 75486, at *2-3 (N.D. Tex. July 13, 2011) (same). A "leased worker" is defined by those policies as "a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business." *Wellington Specialty Ins.*, 434 F. App'x at 796. A "temporary worker" is

defined as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." *Key Constr.*, 2011 U.S. Dist. LEXIS 75486, at *3. Greenspring contends that a nurse from a staffing agency would be referred to in the insurance context as a "leased worker" or a "temporary worker," and that the absence of those terms from the Greenspring policy means that the policy does not intend to cover someone like Nurse Hand.

In construing insurance policies, however, District of Columbia courts are primarily concerned with "'the meaning which common speech imports,'" not the meaning that other insurers' would ascribe to the same term. *Travelers Indem.*, 770 A.2d at 986 (quoting *Estate of Corriea*, 719 A.2d at 1239). In any event, the definition of "employee" set forth in those other policies hardly impugns the conclusion that Nurse Hand qualifies as an "employee" under the Greenspring policy. To the contrary, the language of those policies suggests that the term "employee" is generally understood to include "leased workers," and Nurse Hand appears to fit in the category of leased workers according to the description of that term in those policies. *See Wellington Specialty Ins.*, 434 F. App'x at 796. And even if Nurse Hand were a "temporary worker," the language of the other policies could be read to indicate that the term "employee" would ordinarily encompass temporary workers *unless* the policy expressly excludes them. As a result, the fact that the Greenspring policy contains no mention of "leased workers" or "temporary workers" in its definition of "employee" affords no basis for concluding that the policy excludes Nurse Hand from that term.

## B.

In understanding the meaning of "employee" in the Greenspring policy, the district court found it "helpful" to

12

consider the test used by District of Columbia courts when assessing whether a person is an "employee" for vicarious liability purposes. *Interstate Fire I*, 853 F. Supp. 2d at 57. As a "general rule," an entity is vicariously liable for the torts of an employee but not for those of an independent contractor. *See W.M. Schlosser Co. v. Md. Drywall Co.*, 673 A.2d 647, 651 (D.C. 1996). In determining whether a person is an employee or an independent contractor, District of Columbia courts consider multiple specified factors. *See Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 422-23 (D.C. 2006); *Moorehead v. District of Columbia*, 747 A.2d 138, 143 (D.C. 2000); *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000). "'While no single factor is controlling, the decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done.'" *Schecter*, 892 A.2d at 423 (alteration and emphasis omitted) (quoting *Beegle*, 679 A.2d at 485). The district court determined that Nurse Hand is an "employee" of Washington Hospital under that framework because the hospital had the right to control her conduct and to terminate her assignment at any time, and because her care for Ms. Banks was "clearly part of the [hospital's] regular business." *Interstate Fire I*, 853 F. Supp. 2d at 57-58. Greenspring does not dispute the district court's application of the common law test, but instead contends that the court erred by invoking that test in the first place.

District of Columbia and Maryland courts, however, have indicated that the "'known principles of the common law'" can inform the interpretation of insurance policies. *Unkelsbee v. Homestead Fire Ins. Co.*, 41 A.2d 168, 170-72 (D.C. 1945) (quoting *Waters v. Merchs.' Louisville Ins. Co.*, 36 U.S. (11 Pet.) 213, 223 (1837)); *see also Stiegler v. Eureka Life Ins. Co.*, 127 A. 397, 402 (Md. 1925) (common law supplies default rule where terms of insurance policy and statutes are silent). Courts

in other jurisdictions likewise look to common law principles when construing the terms of insurance contracts—at least when the contracts themselves do not expressly displace common law default rules. *See Crawford v. Lumbermen's Mut. Cas. Co.*, 220 A.2d 480, 483 (Vt. 1966) (in answering the "perplexing question" of whether worker is "employee" under insurance policy, "the common law decisions on the relationship of master and servant afford a safe guide"); *see also Collin v. Am. Empire Ins. Co.*, 26 Cal. Rptr. 2d 391, 403 (Cal. Ct. App. 1994); *Quiring v. GEICO Gen. Ins. Co.*, 953 N.E.2d 119, 129 (Ind. Ct. App. 2011); *Detweiler v. J.C. Penney Cas. Ins. Co.*, 751 P.2d 282, 284 (Wash. 1988). Accordingly, we believe that the district court appropriately considered common law principles of vicarious liability in construing the term "employee" in the Greenspring policy. And we agree with the district court that the common law test supports concluding that Nurse Hand qualifies as an "employee" of Washington Hospital.

## C.

Greenspring argues that, instead of looking to dictionary definitions and common law principles to understand the meaning of the term "employee" in the Greenspring policy, the court should rely on an affidavit in the record from Larry Smith, the president of Greenspring and the vice president of risk management for Washington Hospital's parent company, MedStar. According to Smith's affidavit, Greenspring and MedStar both understood that the Greenspring policy would "apply to employees who had been hired by MedStar" and its subsidiaries "but not to temporary workers such as agency nurses." Smith Decl. ¶ 3, ECF No. 35-2.

As we have explained, however, District of Columbia courts apply unambiguous provisions of insurance policies without resort to extrinsic evidence of the parties' subjective intent. The

Smith affidavit, coming eight years after the Greenspring policy was written and more than one year after Interstate Fire filed suit, cannot outweigh the various considerations establishing that Nurse Hand qualifies as an "employee" of Washington Hospital under the Greenspring policy. *See Sears*, 5 A.3d at 661 n.15 (statement made in the course of litigation, "not contemporaneous with . . . or reflected in any of the documents" that constitute the parties' agreement, "cannot serve to render ambiguous contract terms that are otherwise unambiguous"). And even assuming that the policy is ambiguous and that the Smith affidavit affords *some* indication of an intent to exclude agency nurses from coverage, any such indication would be offset by the general rule that "'ambiguities in an insurance contract should be construed against the insurer who drafted the contract . . . where other factors are not decisive.'" *Beck*, 936 A.2d at 751 n.4 (quoting *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999)); *see Estate of Corriea*, 719 A.2d at 1243; *Meade v. Prudential Ins. Co.*, 477 A.2d 726, 728 (D.C. 1984). In the District of Columbia, that canon applies even when—as here—the insurer who drafted the contract is engaged in litigation against another insurance company. *See Imperial Ins., Inc. v. Emp'rs' Liab. Assurance Corp.*, 442 F.2d 1197, 1199-1200 (D.C. Cir. 1970) (binding with respect to local law). Greenspring argues against invoking the canon on the ground that neither Nurse Hand nor Interstate Fire purchased the policy from Greenspring. But District of Columbia courts construe ambiguities in an insurance policy against the insurer even when the claimant is a third-party beneficiary rather than the purchaser of the policy. *See, e.g.*, *Price v. Doe*, 638 A.2d 1147, 1149, 1152 (D.C. 1994); *Nationwide Mut. Ins. Co. v. Schilansky*, 176 A.2d 786, 786-88 (D.C. 1961). The Smith affidavit is certainly not a "decisive" factor in favor of Greenspring's preferred construction, *cf. Beck*, 936 A.2d at 751 n.4, and thus does not alter our conclusion that Nurse Hand is an

"employee" of Washington Hospital under the Greenspring policy.

III.

While Greenspring's primary position is that Nurse Hand is not an "employee" of Washington Hospital, Greenspring also asks us to reverse the district court's decision even if we hold that Nurse Hand *is* an employee covered under its policy. Greenspring puts forward three arguments in support of its alternative position, which we consider in turn.

A.

Greenspring first asks us to follow the Eighth Circuit's holding in *Wal-Mart Stores, Inc. v. RLI Insurance Co.*, 292 F.3d 583 (8th Cir. 2002), as well as cases from other jurisdictions that adhere to the *Wal-Mart Stores* decision. *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 272 (4th Cir. 2004); *Am. Indem. Lloyds* v. *Travelers Prop. & Cas. Ins. Co.*, 335 F.3d 429, 436 (5th Cir. 2003). In *Wal-Mart Stores*, RLI Insurance Company sought to recover $10 million it had paid to settle a product liability lawsuit related to a halogen lamp supplied by Cheyenne Industries and sold by Wal-Mart at one of its retail stores. The district court concluded that Wal-Mart's insurer, National Union, bore primary liability for the settlement costs and that the RLI insurance policy purchased by Cheyenne provided only excess coverage. The district court therefore held that RLI was entitled to recover the $10 million it had paid to settle the halogen lamp lawsuit. *See Wal-Mart Stores*, 292 F.3d at 585-87.

The Eighth Circuit reversed. It held that the vendor agreement between Cheyenne and Wal-Mart obligated Cheyenne to indemnify Wal-Mart for claims resulting from any

alleged defect in the lamps, and it found that the indemnification provisions in the vendor agreement "squarely applie[d]" to the case. *Id.* at 587-88. If National Union paid the $10 million to settle the product liability claim, then "it would step into Wal-Mart's shoes and bring a subrogation action against Cheyenne asserting Wal-Mart's contractual right to indemnification." *Id.* at 594. RLI, as Cheyenne's insurer, would then be obligated to cover Cheyenne for National Union's $10 million indemnification claim, and "the parties would be back in the situation they were in before th[e] action was brought." *Id.* "To prevent such wasteful litigation and to give effect to the indemnification agreement between the parties," the Eighth Circuit held "that RLI cannot recover against National Union." *Id.*; *accord St. Paul Fire*, 365 F.3d at 276-77; *Am. Indem. Lloyds*, 335 F.3d at 444.

Greenspring argues that this case is closely analogous to *Wal-Mart Stores*. Just as Cheyenne agreed to indemnify Wal-Mart for claims arising from the sale of Cheyenne lamps, Progressive agreed to indemnify Washington Hospital for claims arising out of the negligent acts of Progressive's nurses. Greenspring says that if it reimburses Interstate Fire for the cost of defending and settling the Banks litigation, it will then step into the shoes of Washington Hospital and assert Washington Hospital's contractual right to indemnification from Progressive. And Interstate Fire, as Progressive's insurer, will still bear the ultimate loss.

We need not decide whether District of Columbia courts would follow *Wal-Mart Stores*, because that decision would not alter the outcome of this case in any event. First, there is no suggestion in *Wal-Mart Stores* that Wal-Mart had waived its contractual right to indemnification from Cheyenne. Here, by contrast, Washington Hospital released any contractual right to indemnification as part of the Banks settlement. The language

of the release is unequivocal:  it states that Washington Hospital "completely releases and forever discharges" Nurse Hand, Progressive, and Interstate Fire of "all claims, demands, causes of action, obligations, liens, damages, losses, costs, attorneys' fees and expenses of every kind and nature whatsoever" that Washington Hospital "may now have or may hereafter have . . . by reason of any matter, cause or thing arising out of, or in any manner connected with," the Banks litigation. Greenspring never explains how Washington Hospital's contractual indemnification claim could survive such an unambiguous release.

Second, while National Union would have stepped into Wal-Mart's shoes if it paid $10 million on Wal-Mart's behalf to settle the product liability lawsuit, Greenspring would not step into Washington Hospital's shoes if it paid $3.055 million on Nurse Hand's behalf to settle the Banks action.  Greenspring instead would step into *Nurse Hand's* shoes with respect to the $3.055 million payment, and Nurse Hand would have no indemnity claim against Progressive:  an employer "held vicariously liable for the tort of an employee" generally has "a right of indemnity from the employee," not the other way around.  Dobbs' Law of Torts § 425 (2d ed. updated 2014) (West); *see also District of Columbia v. Wash. Hosp. Ctr.*, 722 A.2d 332, 340 n.9 (D.C. 1998).  Thus, even if Washington Hospital had not waived its indemnification claim, Greenspring would have no entitlement to assert the hospital's indemnification claim while standing in the shoes of Nurse Hand.  Unlike in *Wal-Mart Stores*, then, a ruling in favor of Interstate Fire would not result in a "circuity of action."  *Wal-Mart Stores*, 292 F.3d at 594.

18

B.

Greenspring next argues that contribution is an equitable remedy and that the district court erred by failing to take equitable considerations into account. The district court did not err. While contribution is "governed by equitable principles," a contribution action is still "subject to any express or implied agreements between or among the parties sharing the liability." *Green Leaves Rest., Inc. v. 617 H Street Assocs.*, 974 A.2d 222, 238 (D.C. 2009) (footnote omitted). Consequently, "'[w]here the parties have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other equitable duties not chosen by the parties.'" *Id.* (alteration omitted) (quoting *Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996)). Here, Washington Hospital and Interstate Fire were parties to a settlement agreement broadly governing "any matter . . . connected with" the Banks litigation. They agreed to release each other from all claims, demands, and obligations with one exception: Interstate Fire reserved the right to seek reallocation of the settlement based on the language of the insurance policies. The district court had no discretion to displace the terms of that agreement and impose an equitable duty upon Interstate Fire to pay more than the insurance policies provided.

C.

Finally, Greenspring argues that some portion of the $3.055 million paid by Interstate Fire to settle the Banks litigation went to resolve Washington Hospital's contractual indemnity claim against Progressive. Even if it must reimburse Interstate Fire for Nurse Hand's share of the settlement, Greenspring contends, it has no obligation to reimburse Interstate Fire for Progressive's share. We are unpersuaded.

In its third-party complaint in the Banks litigation, Washington Hospital alleged that Progressive, as Nurse Hand's employer, was vicariously liable for Nurse Hand's negligence under the doctrine of respondeat superior. But Washington Hospital asserted no independent negligence claims against Progressive (such as for negligent hiring or negligent supervision). As noted above, an employer who is vicariously liable for an employee's torts may recover from the employee the amount paid to discharge the liability plus reasonable legal expenses. Thus, even if Progressive were vicariously liable to Washington Hospital for Nurse Hand's negligence, and even if some portion of Interstate Fire's $3.055 million payment went to discharge Progressive's liability, Interstate Fire—standing in the shoes of Progressive—would be entitled to recover that amount from Nurse Hand. And Greenspring, as Nurse Hand's primary insurer, would be obligated to reimburse Interstate Fire for any amount that Interstate Fire had paid on account of Progressive's vicarious liability.

\* \* \* \* \*

Because we conclude that Interstate Fire is entitled to reimbursement from Greenspring for the amounts paid to defend and settle the Banks action, we affirm the judgment of the district court.

*So ordered.*