FIRST NAT. BANK & TRUST CO. IN MINNEAPOLIS v. NATIONAL SURETY CORPORATION.

No. 3049.

District Court, D. Minnesota, Third Division.

Nov. 10, 1938.

Stiles & Stiles and F. J. Donahue, all of Minneapolis, Minn., for plaintiff.

Doherty, Rumble, Butler, Sullivan & Mitchell, of St. Paul, Minn., for defendant.

NORDBYE, District Judge.

A discussion of the legal issues requires a rather complete statement of the factual situation. In February, 1927, Harris P. Stone died, and on April 1, 1927, one Weinstock was appointed administrator of his estate. He qualified and filed a bond in the sum of $25,000 furnished by the National Surety Company. Thereafter, he took possession of the estate, and in May, 1928, filed his final account,

reporting in addition to the real estate personal property of the value of $13,608.-04, which sum was increased in his supplemental final account to $13,885.54. On August 24, 1928, the account was allowed by the Probate Court and an order was made distributing all the estate to the decedent's widow, Arvilla Stone. On December 7, 1928, Weinstock as administrator and the Surety Company as surety were discharged and released. On November 17, 1931, guardians were appointed for Arvilla Stone, and on May 12, 1932, pursuant to their petition, the Probate Court set aside the order of December 7, 1928, discharging the administrator Weinstock and his surety. On June 21, 1932, the Probate Court, after a hearing, surcharged Weinstock's account with the sum of $10,256.86 and determined that the true value of the personal property belonging to the estate in Weinstock's hands as administrator was $24,142.40. Apparently, Weinstock had failed and neglected to turn over to the widow any part of the personal property reported in his final account, so that by this order the sum of $24,142.40 became due to her.

In September, 1932, the Surety Company appealed from the orders of the Probate Court of May 12 and June 21, 1932. These appeals were heard in March, 1933, and on August 4, 1933, the District Court filed its decision modifying the orders of the Probate Court, in that the administrator's account was surcharged with the sum of $8,233.97 instead of $10,256.-86. So far as this showing indicates, the orders were in other respects affirmed. The District Court fixed the value of the personal estate in the sum of $22,119.51 as of August 24, 1928. Judgment was not entered on the District Court's decision until February 23, 1935, and on March 8, 1935, the Probate Court in pursuance of said judgment filed its order accordingly. On May 27, 1937, Arvilla Stone died testate, and on June 28, 1937, the plaintiff herein was appointed executor. On December 27, 1937, the Probate Court made and filed its order removing Weinstock as administrator and appointing the plaintiff administrator de bonis non.

On or about April 29, 1933, the National Surety Company became insolvent and the defendant, National Surety Corporation, assumed liability under the bond herein for all losses thereunder, except "losses arising from or caused by acts

committed prior to May 1, 1933." The Probate Court by an appropriate order on December 27, 1937, authorized and directed the plaintiff herein to institute and prosecute all necessary actions against the said Weinstock and his surety or sureties upon his bond, including this defendant. It further appears that on February 8, 1938, in a default action against Weinstock in the District Court of Hennepin County, of which this defendant had no notice or opportunity to defend, the plaintiff obtained judgment against him for the value of the personal property and money belonging to the Stone estate, judgment being entered in the sum of $25,990.34. In the findings of the court, it was recited that the said Weinstock had in his possession personal property and money belonging to the estate of the value of $22,119.51 on March 8, 1935, and further recited that the administrator Weinstock had failed and neglected to pay over said personal property and money to the person or persons lawfully entitled thereto. Interest on said sum at six per cent, together with plaintiff's costs and disbursements, made a total of $25,990.34, the amount of the judgment entered.

That no payment was made of any part of the personal estate due from Weinstock as administrator seems indisputable from the showing made, and if the original surety were a defendant, a mere recital of the admitted facts would require a judgment in favor of the plaintiff herein. The difficulty, however, arises in view of the terms of the assumption agreement, which must be read into the bond of the defendant and given vitality in determining this surety's liability for the loss that apparently has been sustained.

In proceeding with this motion, plaintiff primarily relies on the judgment of the District Court of February 8, 1938, and the recitals in the findings upon which the judgment was entered. Plaintiff urges that this finding unequivocally establishes that an act was committed by Weinstock after May 1, 1933, which resulted in loss to the estate when he failed to turn over the money and property in his possession on March 8, 1935. If the defendant herein is bound by this judgment and the recitals therein, it seems reasonably clear that plaintiff should prevail on this motion. But, however conclusive the order or judgment of the court

in which an official bond is given may be on the surety, the Court has been cited to no authority which affords satisfactory support for plaintiff's contention that the default judgment in District Court is res adjudicata as to this defendant. The suit in District Court was not upon the bond, but based upon money due and owing to the estate, which the court found that plaintiff as administrator de bonis non had a right to recover. Bearing in mind that the defendant had no notice of this uncontested proceeding, it would be an astounding doctrine if, under such circumstances, it could not contest the findings or judgment of that court.

The cases referred to by plaintiff—Connecticut Mutual Life Ins. Co. v. Schurmeier, 125 Minn. 368, 147 N.W. 246; Pierce v. Maetzold, 126 Minn. 445, 148 N. W. 302; First Trust & Savings Bank v. U. S. F. & G. Co., 156 Minn. 231, 194 N. W. 376; National Surety Corp. v. Ellison, 8 Cir., 88 F.2d 399—are authority for the contention that a surety on an administrator's bond is bound by the judgment of the Probate Court in which the matter is pending, though not a party to the proceeding. Presumably, this view is based on the principle that an administrator's bond is "conditioned for the faithful discharge of all the duties of his trust according to law." The surety therefore impliedly agrees that the administrator will obey and comply with all lawful orders of the Probate Court, and by reason of the peculiar nature of its contract, becomes bound by the orders and judgments of that court even though it is not a party to the proceeding. This is not only a practical construction of the surety's liability, but necessarily reflects its intention in entering into the contract. These cases, however, do not suggest any extension of this principle to proceedings in other courts in which the surety is not a party. Furthermore, under no construction of the contract herein can it be maintained that defendant has tacitly consented to be bound by a judgment entered in a District Court in an action which is no part of the probate proceedings, and as to which proceeding it had no notice or opportunity to defend. The case of Connecticut Mutual Life Ins. Co. v. Schurmeier, supra, is not to the contrary. The judgment in that case determined the amount of the claim in the estate which the executors failed to pay in violation of their bond, and the proceeding in Federal Court

was held to be tantamount to a proceeding in Probate Court, in that it determined the amount of the claim. If the surety is bound by the determination of the Probate Court as to the amount of a claim against an estate, necessarily it would be bound by a proceeding in a court ·which was vested with jurisdiction to establish the allowance of the claim and the right of the creditor to be paid from the assets of the estate. However, the default judgment upon which plaintiff relies has no relationship to any Probate Court proceeding. While it grew out of the relationship of Weinstock as administrator to the estate, the proceeding is foreign to, distinct, and apart from the statutory steps outlined for the probating of estates.

The Supreme Court of Minnesota has made its views quite clear. "A judgment recovered against the principal named in the bond for the breach of its conditions in an action in which the surety is not a party, is not evidence against the surety for any purpose except the fact of its rendition." (Citing cases.) Gilloley v. Sampson, 281 N.W. 3, 8. An exception is made in official bonds where the judgment is prima facie evidence as to the surety. Beauchaine v. McKinnon, 55 Minn. 318, 56 N.W. 1065, 43 Am.St.Rep. 506. In probate bonds, the surety undertakes that the principal will obey all orders of the Probate Court, and consequently places himself in privity to any proceeding therein. Pierce v. Maetzold, supra; First Trust & Savings Bank v. U. S. F. & G. Co., supra. It must be concluded, therefore, that this default judgment in the District Court, upon which plaintiff relies, is not res adjudicata as to this defendant and at most is only prima facie evidence that the principal on this bond is indebted to the estate in the sum reflected in the judgment. But, whatever effect the judgment may have in this proceeding, it can scarcely be urged that the recital in the finding referred to is binding upon this defendant. The District Court was required to determine what money was due from Weinstock as the former administrator, and in order to sustain its conclusion of law, it was not necessary for the District Court to determine whether the administrator had possession of the money or other personal property belonging to the estate subsequent to May 1, 1933. It would be no defense on the part of Weinstock to show

that the money had been dissipated prior to May 1, 1933, but it may be a complete defense for the surety. The exclusive authority to adjust accounts between the administrator and estate rests in the Probate Court. It is not without significance that, although the Probate Court in its order of December 27, 1937, removing Weinstock, · as administrator, made the finding that on December 16, 1937, he had in his possession money and other personal property of the value of $22,119.51, which on that date he refused and neglected to turn over to the estate, this finding on appeal to the District Court, by the defendant herein, was eliminated by stipulation of the parties. The record, therefore, is clear that the Probate Court has not determined by any order or judgment whether Weinstock had any money or personal property in his possession after May 1, 1933, belonging to the estate. Under no logical construction of any of the Minnesota decisions is there support for the contention that the finding of the District Court relied upon by the plaintiff in any way conclusively binds the surety on this bond.

Plaintiff urges, however, that if the proceeding in the District Court is not res adjudicata as to the findings and judgment, nevertheless its motion should be granted because after May 1, 1933, demand was made on Weinstock for the shortage and his failure and neglect to make good requires a finding that defendant is liable on its assumption agreement. A consideration of the orders of the Probate Court becomes necessary in order to determine the soundness of plaintiff's contention. It was on June 21, 1932, that the Probate Court made its first order surcharging the account of Weinstock in the sum of $10,256.86, and the value of the personal property in the hands of the representative for distribution was determined to be $24,142.40. An appeal was taken from this order, as hereinbefore stated, and on August 4, 1933, the District Court made its order modifying the final decree of the Probate Court. It was this order upon which judgment was entered in the District Court, and upon which judgment the Probate Court on March 8, 1935, entered its final order. In order to determine what acts Weinstock committed which palpably led to losses in the estate, the findings of the District Court of August 4, 1933, should be examined. It will be observed that these

findings set forth that the administrator Weinstock was discharged as of December 7, 1928. It recites that after his discharge he continued to hold himself out as administrator, maintained the same bank account, collected money, and never disclosed to Arvilla Stone, the decedent's widow, that he had been discharged as administrator. It appears from the findings that at that time Arvilla Stone was impaired physically and mentally. The court found that no part of the balance of the personal property in the sum of $13,885.54, with which Weinstock had charged himself, had ever been turned over to the widow, nor had it been expended in her behalf. The court found that, in order to arrive at the balance of the personal property of the value indicated, Weinstock credited himself with $500, the widow's statutory allowance, which had never been paid to her; that he failed to account for three dividends of $17.50 each received by him between February 1, 1928, and August 24, 1928; that he had failed to account for the sum of $2,933.62, a portion of a fire loss due the estate and received by him in June, 1928; that he had failed to account for 11 shares of common stock of the Standard Light and Power Corporation in the sum of $522.50; that he had failed to account for two months' rent in the sum of $350 received prior to August 24, 1928; that he had failed to account for the sum of $350, representing the payment made on a contract for deed which he had received prior to August 24, 1928. It is further set forth in the findings that, between August 24, 1928, the date of the final decree, and December 7, 1928, the date of the discharge, Weinstock received a dividend of $17.50 due the estate, and after December 7, 1928, during the time he held himself out as administrator, he received five additional dividends of $17.50 each, which receipt he concealed from the decedent's widow. It is recited that he unlawfully credited himself with $800 in fees, and prior to August 24, 1928, he paid a note of $200 without any claim upon said note being filed in Probate Court and without authority or approval of said court. It was found that, at the same time, that is, prior to August 24, 1928, he paid $5,050.70 out of the funds of the estate in payment of a secured promissory note, which was the joint obligation of the decedent and the said Weinstock, and that for one-half of this payment, or $2,525.35, the estate received nothing. The findings further recite that until May 11, 1932, the Probate Court had no knowledge of these various "omissions, concealments, and conversions," and that "Weinstock was guilty of fraud, wilful default and gross negligence in the administration of decedent's estate, whereby said estate has suffered loss. * * * That it was not until after November 1, 1931, that said Arvilla Stone first learned of the concealments, conversions, appropriations and mismanagement of decedent's estate by Weinstock." The denial of credit for the $800 compensation to Weinstock for administrator's fees was evidently predicated on his fraud and gross negligence in performing the duties of administrator.

That this estate has sustained a loss by reason of the acts of Weinstock has unquestionably been established by the proceedings in the Probate Court. The judgment of the Probate Court is binding upon the defendant as surety on Weinstock's bond. The question is, however, when did the acts occur which occasioned the loss? Clearly, it was the intention of the parties to the assumption agreement to except from the liability of the defendant any loss which occurred by reason of acts of the administrator prior to May 1, 1933, regardless when the loss may have actually occurred. Therefore, if the loss had occurred prior to May 1, 1933, the defendant is not liable, and if the loss occurred after that date, due to acts prior thereto, no liability exists. Obviously, this is the only rational interpretation that one can give to the terms and conditions of defendant's contract. The intention of the parties must be recognized and given a reasonable and practical effect. It will be observed that the pleadings establish that the acts of deceit, fraud and gross negligence which occasioned the surcharge, all took place prior to May 1, 1933. The amended answer sets forth in Paragraph VII the following averment: "Alleges that said Weinstock did not have in his possession or under his control at any time after April 30, 1933, property or moneys belonging to the estate of said Harris P. Stone, deceased, nor did he at any time after April 30, 1933, fail and refuse to pay over and deliver to said Arvilla Stone or her representatives any money or property belonging to said estate, and that the losses for which said Probate Court surcharged his account by

order of March 8, 1935, as aforesaid, arose from and were caused by· acts committed long prior to May 1, 1933. That said Weinstock is and from a time long prior to May 1, 1933, has been wholly insolvent."

Consequently, if it be true that Weinstock had dissipated the entire personal estate prior to May 1, 1933, and was thereafter insolvent, can it be urged that the loss to the estate did not occur prior to the assumption of suretyship by the defendant? If the allegation in Paragraph VII of the amended answer is true, and there is no order, judgment or decree of the Probate Court to the contrary, no liability can be imposed upon the defendant surety without doing violence to the plain intendment of the parties to the assumption agreement.

Plaintiff relies on the decision of the Supreme Court of Minnesota in Bromen v. O'Connell, 185 Minn. 409, 241 N.W. 54, 82 A.L.R. 583. In that case, the court was considering the liability of the sureties on a guardian's bond where the defalcation occurred during the period covered by the guardian's first bond, that is, before the second surety executed the second bond. The court stated (page 412, 241 N.W. page 55): "Under bonds of the tenor of the one we are now considering, the sureties are held liable for the failure of their principal to account, even though the initial wrongdoing antedates the bond. The resulting duty to make good the loss continues to the end."

If the defendant in the instant case had assumed the outstanding bonds of the Surety Company without reservation or exception, the Bromen Case would be decisive of the issues presented herein. It is undoubtedly recognized by the Minnesota decisions that an administrator has the duty to make good any loss to the end of his stewardship, and the surety on the bond insures the performance of that duty. In the instant situation, the obligation that rests upon the surety is limited by ·the exceptions in the assumption · agreement. If the only losses in this case occurred by reason of acts of the administrator prior to May 1, 1933, it is clear that the parties intended that ·no liability should be assumed. To hold otherwise would be to emasculate the exception of liability. The distinction in the contract of ·the surety in the Bromen Case and in the instant case is apparent. Plaintiff points out that, in

National Surety Corp. v. Ellison, supra, the Circuit Court of Appeals cited the Bromen Case with approval on a state of facts not unlike the instant case. A careful reading of the Ellison Case, however, discloses a significant difference in the factual. situation from the case at bar. In that case, the court was considering the same assumption agreement· which is controlling herein. The defendant surety corporation was held liable under its assumption contract because the administratrix had failed to account after May 1, 1933, for certain moneys in her possession due the estate. Under the circumstances, the court held that the acts which occasioned the loss occurred after May 1, 1933. There were two items of loss discussed; first, the failure of the administratrix to sell real estate belonging to the estate within a reasonable time, and second, the purchase by the administratrix of a note belonging to the estate at a discount and thereafter the collection by her in full. The first item of loss clearly was occasioned by an act occurring after May 1, 1933, because the Probate Court made a finding that the reasonable time within which to sell did not expire until May 16, 1934. The Circuit Court of Appeals stated that "the delay, neglect, and failure to act were, of course, continuous from some indefinite time prior thereto up until May 16,.1934." 88 F.2d 404.

The second item presents a more difficult question, in that the entire transaction involving the purchase and collection of the note occurred prior to May 1, 1933. The court concluded, however, that the act which occasioned the loss did not occur until the time to account arrived. This was after May 1, 1933. On July 12, 1935, the Probate Court found that the administratrix withheld $5,230, the profit on the transaction, and required her to account therefor, which she. failed to do. In failing to obey the court, she performed an act for the first time which gave rise to the loss. The Circuit Court of Appeals quoted the findings of the Probate Court to the effect that the administratrix after May 1, 1933, "had the money 'in her possession' and required her to account therefor. She failed to do so." The profit made on this note transaction belonged to the estate. *No illegal or negligent act, however, was necessarily perpetrated until the administratrix failed to account for the profit.* If the profit had been made and accounted for in good faith by the ad-

ministratrix, no criticism could have been directed at her conduct in handling this particular transaction. It must be assumed that the Circuit Court of Appeals had in mind that, in view of the particular transaction involved, there was no wrongful act performed by the administratrix which occasioned any loss until she refused to account for this profit after a demand had been made upon her. It will be noted that the court emphasized the fact that the administratrix had the money in her possession when the demand was made. No such showing appears in the instant case. Therefore, the Ellison Case must be construed in light of its own facts and its teachings limited accordingly. It may be that some of the items included in the shortage herein were not in and of themselves the result of unlawful or illegal acts and that no loss occurred until a demand was made on the administrator. Whether it can be held in light of the Ellison Case that the act which occasioned the loss under such circumstances occurred after May 1, 1933, cannot be determined as a matter of law on the present record.

■ The record indicates that the administrator did account for some $13,885.54 in his final account and was discharged in August, 1928. It became his duty immediately to turn over this sum to the sole heir in conformance with the decree of the Probate Court. Can it be urged that the failure to pay this amount to the sole distributee did not constitute an act occurring prior to May 1, 1933, and which resulted in loss to the estate? Following the teachings of the Ellison Case, the failure to account for the $13,885.54, in conformance with the order of the Probate Court, was the act which occasioned the loss. Under no interpretation of the pleadings and exhibits attached can it be held as a matter of law that the surety must make good this portion of the loss. The remaining items with which the administrator's account was surcharged consist of shortages occasioned by various acts of conversion, wrongful appropriation, deceit and fraud, each and every act taking place prior to December 7, 1928. It was some time prior to May 11, 1932, that Arvilla Stone, according to the findings, became aware of "the concealment, conversion, appropriation, and mismanagement of decedent's estate." It was on June 21, 1932, that the Probate Court surcharged Weinstock's account in the sum of $10,256.86. This was the status of the Stone estate when the defendant surety assumed its contract. The entire picture disclosed by the pleadings negatives the contention that any act or acts were committed by the administrator after May 1, 1933, which occasioned loss to the estate. Certainly, if it be true as the pleadings and exhibits intimate that Weinstock plundered the estate prior to the assumption of suretyship by the defendant, the latter's liability cannot arise in absence of proof that thereafter some act was committed comparable to the situation that existed in the Ellison Case. If, for instance, it can be established at the trial that Weinstock had in his possession all or a part of the estate after May 1, 1933, and failed to account for the same, the Ellison Case is authority for the imposition of liability upon the defendant to that extent. In view of the Court's determination, however, that the default judgment of the District Court of February 8, 1938, does not bind the defendant, the pleadings do not establish a situation within the teachings of the Ellison Case. But it may be urged that there was a continuing duty that rested upon Weinstock to make good the loss, and that this duty did not· end until he was discharged as administrator on December 27, 1937, and regardless of the fact that he may have been insolvent and had dissipated the entire estate, prior to May 1, 1933, and could not comply with the order of the court, he nevertheless breached his duty to reimburse the estate when the demand was made after May 1, 1933, and such failure to comply with the court's order occasioned the loss to the estate within the meaning of the assumption agreement. However, a fair and reasonable construction must be given to the language used in the assumption agreement, which is clear and free from ambiguity. It is evident that the parties intended that the surety corporation should not assume liability for losses already sustained, or losses to be sustained, by acts of wrongdoing or carelessness of the principal which had already occurred. The act contemplated was that which became the proximate cause of the loss, not some imaginary or fictitious cause. If one is intrusted with trust funds and he violates the trust by spending the estate for his own personal use and has no funds with which to make good the loss, it does not require much argument to convince any reasonable person that an act has occur-

red which has caused the beneficiary loss. True, the duty rests upon the trustee until he is released from his trust to make good such shortage, and demands may be made upon him from time to time to replenish the trust estate, but one could scarcely be justified under the circumstances in indulging in the fiction that the act which occasioned the loss was the failure of the impecunious trustee to comply with a futile request. Manifestly, the act causing the loss was the unlawful conversion.

The assumption contract was executed, delivered, and became effective in the State of New York. It appears from the decisions of the Appellate Courts of New York that the failure of an administrator, executor or guardian to account after May 1, 1933, for funds dissipated before May 1, 1933, does not give rise to any liability on the part of this defendant under the identical contract in suit.

In Coleman v. National Surety Corporation, 244 App.Div. 244, 278 N.Y.S. 826, the guardian prior to December, 1931, had deposited certain guardianship funds in a trust company which failed in December, 1931, resulting in a loss of the funds. On an accounting after May 1, 1933, the guardian was surcharged with the amount. As here, the National Surety Company was the original surety of the guardian, and suit was brought against the surety corporation to recover under its contract with the company. The following pertinent language is found in the opinion [page 831]: "But even disregarding any question of election or estoppel, we are of opinion that the loss for which the defendant is sought to be held liable was a loss 'arising from or caused by acts committed' before May 1, 1933. We must distinguish here between 'losses' and the 'acts' by which they are occasioned. The defendant did not agree to pay except for losses sustained by the estate on or after May 1, 1933. It did not agree to pay even for such losses if they were caused by acts committed previous to May 1, 1933. The plaintiff's contention that in the present case both the 'act' and the 'loss' consisted in Steinbach's failure to pay in accordance with the order of November 9th disregards the language and intent of the assumption certificate, which plainly discriminates between the two. * * * In the present

case there would have been no loss after May 1, 1933, except for the illegal act committed long before. Whether produced by a charge or by a surcharge, that loss is attributable to the deposit of the funds in the Seacoast Trust Company, resulting in the depletion of the estate and the inability of the committee to turn over the balance constructively in his possession."

The views expressed also find support in the following New York cases: In re Estate of Julius Lustig, 240 App.Div. 405, 270 N.Y.S. 91; In re Estate of Beckie Propp, 241 App.Div. 863, 271 N.Y.S. 990; In re Sacks' Estate, 153 Misc. 262, 274 N.Y.S. 707; In re Copstein's Estate, 155 Misc. 424, 279 N.Y.S. 411.

In National Surety Corp. v. Laughlin, 178 Miss. 499, 172 So. 490, an administrator had failed to account after May 1, 1933, for funds misspent and misappropriated prior to that date. The National Surety Corporation was held not liable under its assumption contract, the court stating [page 494]: "At most, it can be only a limited assumption of liability upon which the statute does not operate to enlarge its terms so as to include liabilities not contemplated upon the execution thereof. * * * Since, in our opinion, the assumption of liability certificate is merely evidence of a limited assumption of liability, there is no liability against the appellant except for devastavits occurring after May 1, 1933."

In Wells v. National Surety Corp., 128 Pa.Super. 373, 194 A. 201, the court considered an ancillary receiver's bond of the National Surety Company. The view of the court is stated in the second syllabus to the opinion, which reads as follows: "Under surety's assumption agreement excluding liability on fiduciary bonds for losses occurring before May 1, 1933, surety was not liable for surcharges assessed against administrator of ancillary receiver of a bankrupt based on disbursements made prior to May 1, 1933, notwithstanding the filing of the account and date of audit was subsequent to May 1, 1933, as against contention that the 'act' causing loss was the failure to explain the items and that this took place after May 1, 1933."

In view of the disposition of plaintiff's motion, the Court does not find it necessary to pass upon the statute of limitations or plaintiff's right to sue as administrator

de bonis non by reason of the decree of distribution filed by the Probate Court.

It is ordered that plaintiff's motion be and the same hereby is in all things denied. An exception is allowed to the plaintiff.