**HARTFORD FINANCIAL SERVICES GROUP, INC., Appellant,**

v.

**Patrick T. HAND, Appellee.**

**No. 10–CV–823.**

District of Columbia Court of Appeals.

Argued March 30, 2011.
Decided Oct. 27, 2011.

James W. Novak for appellant.

Patrick T. Hand, in his capacity as conservator and guardian of the property of Clifton D. Smith, pro se.

Before GLICKMAN, and THOMPSON, Associate Judges, and RUIZ, Associate Judge, Retired.*

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status

**THOMPSON, Associate Judge:**

Appellant Hartford Financial Services Group, Inc. ("Hartford") seeks reversal of a summary judgment ruling requiring it (in its capacity as surety) to reimburse the estate of Clifton Smith for $130,098.31 (plus post-judgment interest), the amount the estate paid to satisfy a Maryland judgment that was entered against appellee Patrick Hand ("Hand") in his capacity as guardian of the estate. We affirm in part, reverse in part, and remand for further development of the record.

**I.**

This matter, which was litigated in the Superior Court Civil Division, arises out of a guardianship matter that was administered in the Superior Court Probate Division under Docket No. 23–94, *In re Estate of Clifton Smith*. In his Civil Division Complaint and in the pleadings accompanying his motion for summary judgment, Hand asserted (and Hartford did not contest) the following facts: In September 2003, Hartford issued and the Probate Division approved a surety bond in the amount of $30,000 on behalf of principal Cordelia Smith ("Cordelia"), who was then the guardian of the estate (the "Estate") of her son Clifton Smith ("Clifton"). A few months later, on November 6, 2003, Hart-

ford issued and the court approved an "Increase Rider," by which the penal sum of the bond was increased to $204,000. In June 2004, the Probate Court removed Cordelia as guardian, finding that in 1997, in her capacity as guardian, she had used real property that had been purchased as a residence for Clifton with funds derived from a personal injury settlement ("the Clinton, Maryland house") as security for a bank loan. The court appointed appellee Patrick Hand as successor guardian (and thereafter, upon Clifton's eighteenth birthday, as Special Conservator of Clifton's estate).[1]

Cordelia eventually defaulted on the bank loan and, in 2005, note-holder M & T Bank initiated proceedings in Maryland to recover on the note. Guardian Hand defended on the grounds that Cordelia had "lacked legal capacity to sign the note" and "had no authority to borrow money on behalf of the guardianship." *Hand v. Mfrs. & Traders Trust Co.*, 405 Md. 375, 952 A.2d 240, 244, 245 (2008) (cited in Hand's Statement of Material Facts Not in Dispute at ¶ 15).[2] After the Maryland trial court ruled in favor of M & T in August 2006, Hand sold the Clinton, Maryland house to satisfy the judgment. In a July 24, 2008 opinion, the Maryland Court of

---

changed to Associate Judge, Retired, on September 1, 2011.

1. The Circuit Court for Prince George's County, Maryland also appointed Hand as Guardian of the Property of Clifton D. Smith in CAE No. 05–17405.

 In a Suggestion of Death filed in this court on August 4, 2011, Hand notified the court that Clifton died on July 28, 2011.

2. Hand argued that Cordelia had "neglected to obtain permission from the court in the District of Columbia in respect to the execution of the deed of trust." *Hand*, 952 A.2d at 244. He cited D.C.Code § 21–157 (2001), which provides in relevant part that "[w]here it appears to the court by proof that it would

be for the advantage of the infant to raise money by mortgage ... the court may, on the application of the guardian ... decree a conveyance of the property, by mortgage or deed of trust...." We note tangentially that the Maryland Court of Appeals observed that "[i]t is not altogether clear how a court in a foreign jurisdiction 'decrees' the sale of property in Maryland[,]" and that Maryland law generally does not require court approval for such a conveyance. *Id.* at 244 & n. 6; *see also id.* at 258 n. 16 ("[T]he Maryland statute permitted guardians to do just what the guardian did in executing and delivering the bill obligatory.").

Appeals upheld the judgment in favor of M & T. *Id.* at 242.

Hand then brought a subrogation action in the Superior Court to recover the judgment amount from Hartford, asserting that under the surety bond and Increase Rider, Hartford was "liable for the breaches of [Cordelia,] its Principal." When Hand thereafter moved for summary judgment, Hartford opposed the motion on the grounds that the judgment arose from Cordelia's conduct in 1997, when she borrowed money using the Clinton, Maryland house as collateral; that at the time, another company (Peerless Insurance Company ("Peerless")) was the surety for Cordelia and thus was "responsible for her defalcations" in 1997; that the Increase Rider contained an express limitation on Hartford's obligation to pay the increased penal sum of $204,000, making that amount available only as to losses occurring after November 6, 2003, the effective date of the rider; and that Hartford therefore was not liable.

The Superior Court granted summary judgment in favor of Hand. The court reasoned that the "loss" resulting from Cordelia's conduct "was not realized by Clifton's estate until August 2, 2006, when judgment was entered in favor of M & T" by the Maryland trial court. Order Granting Mot. Summ. J. Judgment Order ("Order") at 4. The court also cited authority that, in the case of bonds for the protection of minors, incompetent persons, or estates, the general rule that a bond "do[es] not operate retroactively so as to cover defaults arising prior to execution" is not followed if the fiduciary has not yet been called upon to account for a misappropriation committed before the bond was issued. Order at 4. In addition, the court reasoned that any ambiguity in the terms of the Hartford bond should be resolved in favor of the insured, so as to protect the interest of the ward. Order at 5. Finally, the court observed that Hartford could not be surprised at being held liable for losses arising from Cordelia's actions since it had a duty as "a subsequent surety to ascertain the condition of the ward's estate before binding [it]self as surety on a guardian's bond." *Id.*

This appeal followed.

## II.

■ "Our review of the trial court's [summary judgment] award is de novo: summary judgment may be granted only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Mamo v. Skvirsky,* 960 A.2d 595, 599 (D.C.2008) (internal quotation marks and citation omitted); *see also Urban Dev. Solutions, LLC v. District of Columbia,* 992 A.2d 1255, 1266 (D.C.2010) ("In determining whether a party is entitled to judgment as a matter of law, we must satisfy ourselves that no genuine issue of material fact exists" and we must "review the pleadings and other papers that comprise the record on appeal *de novo.*" (internal quotation marks and citations omitted)).

■ "Where ... the dispute hinges on the interpretation of a contract, ... summary judgment is appropriate if the contract is unambiguous...." *Mamo,* 960 A.2d at 599. "However, if the contract is ambiguous, its proper interpretation requires consideration of extrinsic evidence, which precludes summary judgment unless the probative evidence marshaled by the movant eliminates any genuine dispute about what a reasonable person in the position of the parties would have thought the contract means." *Id.* "The determination of whether a contract is ambiguous is a question of law, which we review *de*

*novo." DLY–Adams Place, LLC v. Waste Mgmt. of Md.,* 2 A.3d 163, 166 (D.C.2010).

### III.

### A. *Hartford's Liability Under the September 2003 Surety Bond*

Hartford argues that the "essential fact for the resolution of this appeal" is the fact that it expressly limited its liability through a clause in the November 6, 2003 Increase Rider. The pertinent clause is italicized in the following excerpt from the Increase Rider:

> NOW, THEREFORE, in consideration of additional pre-pay premium of One Thousand Seven Hundred Fifty Dollars ($1,750.00), it is hereby agreed by the PRINCIPAL and the SURETY that the amount of said bond, to which this rider is attached and made a part thereof, is increased to Two Hundred Four Thousand Dollars ($204,000.00), *such increase to be effective as of November 6, 2003, for losses occurring thereafter,* all other terms, conditions, and limitations of said bond to remain in full force and effect as originally executed[.] (Emphasis added).

We agree that we must focus on the "losses occurring thereafter" clause on which Hartford relies in order to determine whether to uphold the trial court ruling holding Hartford liable for the full amount of the Maryland judgment. Before turning to that clause, however, we must begin by examining the language of the surety bond that Hartford issued in September 2003. That is because, by the express terms of the Increase Rider, "all other terms, conditions, and limitations of said [September 2003] bond ... remain in full force and effect as originally executed."

█ The September 2003 surety bond provided as follows:

> Now the conditions of this undertaking are, and we, the undersigned Cordelia Smith guardian to Clifton D. Smith as principal and Hartford Fire Insurance Company as surety, do hereby undertake, that the above Cordelia Smith shall faithfully account to the Court[,] as required by law, for the management of the property and estate of the Minor under her care, and shall also deliver up said property and estate agreeably to the order of the Court or the direction of law, and shall in all respects fa[i]thfully perform the duty of guardian to the said minor according to law and without injury or damage to any person interested in the same, and shall in all things abide by and perform such judgment or decree as the Court may make in the premises.
>
> And we, the said Cordelia Smith principal, and Hartford Fire Insurance Company surety, do hereby appear and submit ourselves to the jurisdiction of the Court, and undertake for ourselves and each of us, our and each of our heirs, executors, administrators, successors, and assigns in the maximum sum of Thirty Thousand ($30,000.00) dollars, to abide by and perform the judgment or decree of the Court in the premises, and further agree that, upon default by the principle [sic] in any of the conditions hereof, the damages may be ascertained in such a manner as the Court shall direct, that the Court may give judgment hereon in favor of any person thereby aggrieved against us as principal and surety for the damages, not exceeding Thirty Thousand ($30,000.00) dollars, suffered or sustained by such aggrieved party and that such judgment may be rendered in the above entitled cause or proceeding against all or any of us whose names are hereto signed, as provided by D.C.Code § 16–601 (1981 ed.)[.]

As can be seen from the quotation above, nothing in the September 2003 bond purports to limit Hartford's liability to liability

for losses occurring after issuance of the bond. Moreover, while the general rule is that fidelity bonds "are held to operate only prospectively from their dates, and do not operate retroactively so as to cover defaults arising prior to execution," [3] in most jurisdictions that have ruled on the issue, a contrary rule applies with respect to bonds "required in court proceedings for the protection of minors, incompetents, or estates." [4] "[T]he apparent majority of courts and authorities addressing this issue have reached [the] conclusion" that a surety is liable for misappropriations by a guardian or conservator prior to issuance of the bond if the bond guaranteed that the guardian or conservator would faithfully account for the assets she controlled [5] (at least in cases where the bond does not expressly disclaim liability arising out of a prior default).[6] The explanation frequently offered is that sureties on guardianship bonds "agree that their principal will do what he is ordered to do, when his accounts are settled by [the] court" and thus

incur liability "based upon the obligation of the guardian to make a true account, and to pay over and deliver to the person lawfully entitled to receive the same the moneys and property found due upon his final settlement with the court," making it "immaterial when the conversion or misappropriation took place." *S. Sur. Co. v. Burney*, 34 Okla. 552, 126 P. 748, 750 (1912); *see also Pacheco*, 199 P.3d 676, 681–82 (reasoning, in a dispute involving Hartford, that where the guardian is required to file an annual accounting in connection with her administration of an estate and to account for and turn over all assets, the surety is liable for her default in failing to do so, without regard to the time when her misappropriation took place (citing 11 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 166:63, at 166–54 (3d ed.1998))).

■ In this case, as required by law [7] and as quoted above, the September 2003 bond guaranteed that Cordelia would "fa[i]thfully perform the duty of guardian

---

3. 11A JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 6712, at 407–08 (1981).

4. APPLEMAN, *supra*, § 6713, at 415 (describing the rule "generally" but not unanimously followed in the case of guardianship bonds).

5. *In re Pacheco*, 219 Ariz. 421, 199 P.3d 676, 682 (Ariz.Ct.App.2008); *but see, e.g., Bolmer v. U.S. Fid. & Guar. Co.*, 11 F.Supp. 560, 563 (W.D.Ky.1935) ("The liability on the bond does not extend to prior defaults of the committee before its execution.").

6. *See, e.g., Md. Cas. Co. v. Waldrep*, 126 F.2d 555, 559 (10th Cir.1942) ("[I]n Oklahoma the surety on a second or subsequent general bond of a guardian which does not expressly limit liability to losses occurring after a fixed date is liable for any loss arising out of a failure faithfully to execute the duties of the trust, even though the breach occurred prior to the execution of the bond."); *First Nat'l Bank & Trust Co. in Minneapolis v. Nat'l Sur. Corp.*, 25 F.Supp. 392, 398 (D.Minn.1938) (holding that the surety was not liable for

losses arising out of guardian's acts prior to issuance of bond because the bond agreement was "clear and free from ambiguity" and made it "evident that the parties intended that the surety corporation should not assume liability for losses already sustained, or losses to be sustained, by acts of wrongdoing or carelessness of the principal which had already occurred"); *Suffolk Cnty. Trust Co. v. Nat'l Sur. Corp.*, 249 A.D. 639, 639, 291 N.Y.S. 82 (N.Y.App.Div.1936) (holding that surety was not liable for losses arising out of 1931 acts by the principal, a "committee of an incompetent person," because the bond agreement limited the scope of the surety's undertaking by providing that the surety "would assume liability on fiduciary court bonds for 'all losses occurring on and after the 1st day of May, 1933, and all losses as to which no notice was received by the Old Company prior to Midnight of April 30th, 1933'").

7. See D.C.Code § 21-115, which provides that:

A guardian appointed by the court, other than a corporation authorized to act as

... without injury or damage to any person interested in the same," would "faithfully account to the Court" for the property of the Estate, and would "deliver up said property and estate agreeably to the order of the Court," and that upon Cordelia's default, the court would be entitled to "give judgment ... in favor of any person thereby aggrieved" against Hartford as surety for the damages, up to $30,000.00." In addition, District of Columbia law required Cordelia as guardian to make an annual accounting, i.e., "once in each year, or oftener if required, [to] settle an account of h[er] trust under oath." D.C.Code § 21–143. And, although our court has not previously considered whether to adopt the majority rule regarding the liability of a surety for acts of the guardian prior to execution of the bond, our guardianship statute evinces a legislative intent to require a surety to assume liability for at least some pre-bond conduct of the guardian with respect to guardianship assets. *See* D.C.Code § 21–119 (providing

that "[a]n allowance made to a guardian for the clothing, support, maintenance, education or other expenses incurred for the ward or his estate, before the guardian gives bond or is appointed, has the same effect in law as if made subsequently to the appointment of the guardian and his giving bond").[8] For these reasons, and because in the September 2003 bond Hartford did not disclaim liability for damages related to defaults by Cordelia prior to issuance of the bond, we follow what appears to be the majority rule and hold that Hartford is liable to reimburse the Estate for at least $30,000 (corresponding to the penal sum of the September 2003 bond) of the amount that the Estate paid to satisfy the Maryland judgment.[9] Accordingly, we affirm the summary judgment ruling in part.

## B. *Hartford's Liability Under the November 2003 Increase Rider*

As already noted, a guardianship bond "must be construed in light of

---

guardian, and a testamentary guardian, unless otherwise directed by the will making the appointment, before entering upon or taking possession of or interfering with the estate of the infant, shall execute a bond in such penalty and with such surety as the court approves, to be recorded and to be liable to be sued upon for the use of a person interested, with the condition that if he, as guardian, faithfully accounts to the court, as required by law, for the management of the property and estate of the infant under his care, and delivers up the property agreeably to the order of the court or the directions of law, and in all respects performs the duty of guardian according to law, then the obligation shall cease; it shall otherwise remain in full force.

8. *See also Beck v. Cont'l Cas. Co. (In re May)*, 936 A.2d 747, 751 (D.C.2007) (explaining that "[f]idelity bonds mandated by statute ... must be interpreted 'in harmony' with the statutory scheme." (citing 11 Couch on Insurance 3d § 166:28, at 166–28 (footnote omitted))).

9. Hartford directs our attention to the Probate Division's order that Cordelia's previous surety, Peerless, "shall stand discharged of further liability [under the bond it issued], except for default, if any, prior to the approval of the surety on the new undertaking hereby authorized." Citing that order, Hartford protests that it is Peerless that "was and remains liable" for the claim at issue. That may be so, but it does not mean that Hartford is absolved of liability, as sureties may be jointly liable for losses occasioned by the misdeeds of a principal. *See generally* Appleman, *supra*, § 6752, at 5–6 (explaining that "[w]here a guardian gives successive bonds with different sureties, the sureties are jointly and severally liable," and that "where a guardian converted his ward's funds before the discharge of the bond in effect [at] the time the funds came into his hands, and an action therefor was brought after execution of another bond, the sureties on both bonds were held liable to the ward[] for the money converted").

the purpose of the statute."[10] Nevertheless, we recognize the general rule that "the liability of a surety cannot be extended beyond the terms of the surety contract."[11] Applying that principle, we will not refuse to give effect to the "losses occurring thereafter" clause contained in the Increase Rider. The question is, what does the "losses occurring thereafter" clause mean?[12]

We begin our analysis by observing that the September 2003 surety bond (which the Increase Rider declared would "remain in full force and effect as originally executed" except as to the penal sum payable for losses occurring after November 6, 2003) does not define the term "loss." However, as already discussed, it does set out an undertaking by Cordelia and by Hartford, as surety, that Cordelia would faithfully manage Clifton's property and estate and perform her duties as guardian "without injury or damage to any person interested in the same," and it also establishes that Hartford is liable for "damages" as may be "ascertained" due to "default" by the principal, Cordelia. Upon the parties' execution of the Increased Rider, there continued in effect the term conditioning Hartford's liability on a default by Cordelia in performance of her duties as guardian. What changed was the penal sum, and it is notable that the parties to the bond did not tie Hartford's liability for that increased sum to "damages ... ascertained" after November 6, 2003, or to "default[s] by the princip[al]" thereafter, as they might have done (had this been their intent) by employing the same streamlined terminology used in the September 2003 bond.[13] The Increase Rider's reference to "losses occurring thereafter" appears instead to be a shorthand reference to (the more cumbersome) "injury or damage to" "the property and estate of the Minor under [Cordelia's]

10. *May*, 936 A.2d at 751 (quoting *Cooper v. Hartford Fin. Servs. Grp., Inc.*, No. 04–383, 2005 WL 1378907, at *1, 2005 U.S. Dist. LEXIS 11434, at *6 (D.D.C. June 9, 2005)).

11. *In re Estate of Spinner*, 717 A.2d 362, 366 (D.C.1998); *see also Cooper*, 2005 WL 1378907, at *1, 2005 U.S. Dist. LEXIS 11434, at *6 ("A bond is a contract and is to be interpreted in accordance with established rules of contract construction." (citing *United States v. Ins. Co. of N. Am.*, 131 F.3d 1037, 1041–42 (D.C.Cir.1997))).

12. The proper interpretation of the Increase Rider, "as of any contract, including whether [it is] ambiguous, is a legal question, which this court reviews *de novo*." *May*, 936 A.2d at 750 (citation and internal quotation marks omitted). To interpret the "losses occurring thereafter" clause, we must "apply established rules of contract interpretation." *Id.* That is, "we adhere to an 'objective' law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract, unless the

written language is not susceptible of a clear and definite" meaning. *Id.* at 751 (citations and internal quotation marks omitted); *see also id.* ("[w]here insurance contract language is not ambiguous," it "speaks for itself and binds the parties without the necessity of extrinsic evidence" (citation and internal quotation marks omitted)). "A contract is not ambiguous merely because the parties disagree over its meaning." *Id.*

As far as we can tell from the case law, the phrase "losses occurring thereafter" does not appear to be a standard insurance-industry term; we are aware of no reported decision that construes that precise phrase as it appears in a surety bond or other insurance contract.

13. Accordingly, the term "loss" as used in the Increase Rider must be understood as meaning something other than "damages" (per BLACK'S LAW DICTIONARY, "money claimed" or "ordered to be paid") and something other than "default." *Cf. Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 198 (4th Cir.2005) ("[A]n insurance policy should be construed to give different meanings to different terms utilized therein.").

care" occurring after November 6, 2003. This interpretation does not advance our analysis very far, however, because it does not answer the question of when injury or damage to the estate—a "loss"—can be said to occur.

■ Issues about the time of loss or occurrence of loss are frequent topics of analysis in the insurance case law. In the context of insurance policies covering the risk of physical injury to property, the general rule is that a compensable injury occurs when actual damage to property is discovered by the insurance beneficiary. *See, e.g., Wrecking Corp. of Am. v. Ins. Co. of N. Am.*, 574 A.2d 1348, 1350–51 (D.C. 1990) (noting that "the prevailing rule is that property damage occurs at the time the damage is discovered or when it has manifested itself"; citing authority that "where a policy insures against an 'occurrence,' rather than an 'accident,' coverage is based not upon the time when the wrongful act was committed but at the time the damage was discovered"; and holding that the property damage occurred when a wall collapsed (on a date outside the policy coverage period), not when the demolition contractor negligently removed the wall's structural support and set in motion a process that resulted in the col-

lapse) (citations and internal quotation marks omitted).[14] The general rule appears to be otherwise, however, with respect to insurance policies that protect against loss due to non-physical damage. Cases involving coverage under so-called banker's blanket bonds or depositary bonds provide a useful example; courts in these cases have concluded that the time of a loss is not when the fact of loss is discovered by the insured, but when the insured's financial assets are placed in jeopardy. For example, in *Eliot Sav. Bank v. Aetna Cas. & Sur. Co.*, 310 Mass. 355, 38 N.E.2d 59, 62–63 (1941), the court held that a loss to the plaintiff bank within the coverage of the bond occurred when the bank lent money upon a forged note and collateral (a certificate pledging shares of stock, delivered under a forged power of attorney)—i.e., when the worthless note and certificate were received—*not* years later when the borrower defaulted on the loan and the bank sold the collateral, subsequently learned of the forgery, and then was required to pay the costs of restoring the true owner of the stock to his original position.[15] In *Chase Nat'l Bank of N.Y. v. Fid. & Deposit Co. of Md.*, 79 F.2d 84 (2d Cir.1935), for example, the court held that where the bank lent money and took cer-

---

**14.** We recognized, however, that "a limited exception exists where the damage can be characterized as being continuous or progressive." *Wrecking Corp. of Am.*, 574 A.2d at 1350 (citation and internal quotation marks omitted). *See, e.g., Leafland Group–II, Montgomery Towers Ltd. Partnership v. Ins. Co. of N. Am.*, 118 N.M. 281, 881 P.2d 26, 27, 29 (1994) (reciting that, after purchasing an apartment building and obtaining an all-risk policy thereon, the insured learned of the presence of asbestos in the building and received an appraisal stating that the asbestos diminished the building's value by $1.75 million; and holding that the insured could not claim coverage under the policy because the "claimed loss occurred prior to the time the insurance was purchased").

**15.** *Accord Citizens Bank of Oregon v. Am. Ins. Co.*, 289 F.Supp. 211, 214 (D.Or.1968) (holding that bank incurred a loss when it made a loan upon the collateral of pledged stock certificates); *Fitchburg Sav. Bank v. Mass. Bonding & Ins. Co.*, 274 Mass. 135, 174 N.E. 324, 328 (1931) (holding that loss to bank occurred, "without regard to its possible remedies, when its funds in fact were diverted … through the fraud and dishonesty of its treasurer," and that the bank could sue on its bond "without proof that it had then sustained some actual defined loss, not merely nominal, as the result of the transaction in question").

tain municipal certificates of indebtedness as collateral, the borrower subsequently became insolvent, and (in 1931) the court declared the certificates of indebtedness to be invalid, the loss occurred when the borrower "closed its doors" (in 1927), making it "practically inevitable that the [bank] would have to collect upon its collateral." *Id.* at 87. The court reasoned that the loss occurred then "even though [the invalidity of the security] had not [by that time] been judicially established" (i.e., even though the bank still held out some hope of remedying its loss and being made whole through sale of the certificates of indebtedness). *Id.*[16]

There are few cases that turn on the time of loss (as distinct from time of defalcation) in the fiduciary bond context, but the cases that do address the issue similarly focus on the solvency of the guardian or other fiduciary (and thus employ reasoning more akin to that followed in the bankers blanket bond cases than to the reasoning followed in property insurance cases). The cases recognize that a loss from the fiduciary's misuse or misappropriation of assets entrusted to her occurs when the fiduciary is or becomes insolvent (meaning that upon demand she would unable to restore the estate to its original position).

*See In re Estate of Sacks,* 153 Misc. 262, 274 N.Y.S. 707, 715, 716 (N.Y.Sur.Ct.1934) (reasoning that when the guardian misused funds belonging to the ward's estate by putting them into his own business, that initially "constitute[d] a diversion but not the destruction or loss of the estate," but that if the guardian "had become absolutely insolvent[,] ... *there would have been proof of loss.*") (emphasis added); *see also First Nat'l Bank & Trust Co. v. Nat'l Surety Corp.,* 25 F.Supp. 392, 397, 398–99 (D.Minn.1938) ("If one is intrusted with trust funds and he violates the trust by spending the estate for his own personal use *and has no funds with which to make good the loss,* it does not require much to convince any reasonable person that an act has occurred which *has caused the beneficiary loss.*") (emphasis added).[17]

 In this case, Cordelia's misuse of Clifton's assets consisted of encumbering the Clinton, Maryland house by pledging it as collateral for a personal loan to Cordelia individually. It could be argued that Clifton's estate sustained a loss at that time in the sense of a diminution in the value of the house: it went from being an asset held free and clear, to an asset held subject to a mortgage.[18] Alternatively, it

---

**16.** Similarly, in *Md. Cas. Co. v. Grays Harbor Cnty.,* 159 Wash. 356, 293 P. 441, 446 (1930), a case involving sureties' liability on a county's depositary bond, the court held that "[t]he sureties should have paid the whole of the county's deposit claim ... upon the incurring of the insolvency of the bank" (and thereupon "could have been let into the shoes of the county as to all of its claims against the assets of the bank"), and that the surety was not entitled to wait to see whether warrants held by the bank, evidencing the county's indebtedness to the bank, were sufficient to offset the bank's deposit indebtedness to the county (and thus to lessen or avert any net loss to the county. *See In re Harvey Cole Co.,* 2 B.R. 517, 520 (Bankr.W.D.Wash.1980) (citing *Grays Harbor* for the point that "suretyship case law has developed the rule that the right

to subrogation does not come into play until full payment of the *loss* ") (emphasis added).

**17.** *See also Reily v. Crymes,* 176 Miss. 133, 168 So. 267 (1936) (discussing insolvency of guardian who had used estate property for his own purposes as basis for enforcing the liability of the surety to the estate of the ward); *U.S. Fid. & Guar. Co. v. Citizens State Bank,* 36 N.D. 16, 161 N.W. 562, 565–66 (1914) (same); *Andrews v. U.S. Fid. & Guar. Co.,* 154 S.C. 456, 151 S.E. 745 (1930) (same).

**18.** This accords with one of the definitions of "loss" set out in BLACK'S LAW DICTIONARY: "the disappearance or diminution of value." *See also Money Store/Empire State, Inc. v. Lenke,* 151 A.D.2d 256, 542 N.Y.S.2d 174, 176

could be argued (as the trial court found) that there was no loss to Clifton's estate until the Maryland trial court held that the note executed by Cordelia could be enforced against successor guardian Hand.[19] The foregoing bond cases, however, support the interpretation that the loss to Clifton's estate occurred when Cordelia became insolvent, unable to pay debt service on the loan when it became due and thus unable to remove the cloud on title and to stave off the institution of foreclosure proceedings against the Clinton, Maryland house. We find the reasoning of the bond cases persuasive and adopt it here.

That said, the present record does not indicate when Cordelia became unable to pay her debts when they were due. The parties' Appendix and briefs tell us, without reference to a date, only that Cordelia "defaulted" on the note (resulting in a 2005 suit by M & T against Cordelia and Hand); the opinion in *Hand v. Mfrs. & Traders Trust Co.* informs us only that "[u]ltimately, the note at issue came in arrears" and "[a] default judgment was entered against Cordelia Smith." 952 A.2d at 244. Cordelia may well have become unable to pay her debts as they fell due only after the November 6, 2003 effective date of the Increase Rider—and thus the loss to Clifton's estate may have occurred after that date as the trial court held—but the record does not supply this detail. We conclude that a remand is in order to permit further development of the record regarding when Cordelia became insolvent (and thus when her misuse of Clifton's major asset occasioned a "loss" to his estate).[20]

For the foregoing reasons, we affirm the judgment of the trial court to the extent that it held Hartford liable, under the September 2003 bond, for $30,000 of the amount that the Estate paid to satisfy the Maryland judgment. We reverse the judgment to the extent that it held Hartford liable up to the amount of $204,000, the penal sum under the November 2003 Increase Rider, and we remand for further proceedings consistent with this opinion.

*So ordered.*

---

(N.Y.App.Div.1989) (noting that a mortgage that husband took out on property without the knowledge of his wife "could only have diminished the value of the property to the [wife]," who doubtless "would have negotiated a different divorce settlement had she known of it").

19. The reasoning implied by the trial court's ruling is that, even after the Increase Rider went into effect, any actual loss to the Estate still could have been averted if the Maryland courts had agreed with Hand that Cordelia "lacked the legal capacity to bind the guardianship of Clifton Smith as to the promissory note" and deed of trust. *Hand*, 952 A.2d at 266 (Harrell, J., dissenting). We note that three judges of the Maryland Court of Appeals did agree with Hand, and would have held that "principles of guardianship embraced under Maryland and District of Columbia law[] should render void any attempt made … to bind the guardianship to re-pay M & T Bank." *Id.*

20. The Probate Division record (particularly as it relates to Cordelia's removal as guardian) may shed some light on this question.